UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ESTATE OF AVRAHAM GOLDMAN, NITZHIYA GOLDMAN, MAYA GOLDMAN COHEN, SHARON GOLDMAN-NAJMAN, GILA NISSENBAUM, NATHAN GOLDMAN, ESTATE OF YONATAN SUHER, INBAL MEROM, G.S., a minor, by his legal guardian INBAL MEROM, U.S., a minor, by his legal guardian INBAL MEROM, RANDOLPH SUHER, YAEL SUHER, AMIR SUHER, EYAL SUHER, ERAN SUHER, and EDEETE SUHER,<br><br>                Plaintiffs,<br><br>    -against-<br><br>LAFARGE S.A., LAFARGE CEMENT HOLDING LIMITED, and LAFARGE CEMENT SYRIA S.A.,<br><br>           Defendants. | **Case No. 24-1043**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.     Plaintiffs Estate of Avraham Goldman, Nitzhiya Goldman, Maya Goldman Cohen, Sharon Goldman-Najman, Gila Nissenbaum, Nathan Goldman, Estate of Yonatan Suher, Inbal Merom, G.S., U.S., Randolph Suher, Yael Suher, Amir Suher, Eyal Suher, Eran Suher, and Edeete Suher bring this Complaint pursuant to 18 U.S.C. § 2333(d) of the Anti-Terrorism Act ("ATA"), 18 U.S.C. §§ 2331-2339D, against Defendants Lafarge S.A. ("Lafarge"), Lafarge Cement Holding Limited ("Lafarge Cyprus"), and Lafarge Cement Syria ("LCS"), who materially supported, financed, conspired with, and aided and abetted the Islamic State in Iraq and the Levant—also known by the alias the Islamic State in Iraq and Syria ("ISIS")—a designated Foreign Terrorist Organization ("FTO") that targeted, murdered, and injured Plaintiffs in a horrific March 19, 2016, suicide bombing in a busy tourist area of Istanbul, Turkey ("the Attack").

2.     Lafarge is one of the world's leading building materials companies.[1] Defendants invested $680 million to construct a cement plant in northern Syria near the Turkish border between the cities of Manbij and Raqqah, which they operated from approximately May 2010 to September 2014—including during the Syrian civil war ("Cement Plant").

3.     That brutal, well-publicized conflict consumed the territory around the Cement Plant. But unlike other multinational companies, which halted their Syrian operations, Defendants instead knowingly engaged, and conspired to engage, in transactions with numerous armed factions in the region, including ISIS.

---

[1]     On April 7, 2014, Defendants and Holcim, another international building materials company, announced that they would merge. That merger closed on July 10, 2015, to create LafargeHolcim, a self-described "world leader in the building materials industry," based in Zurich, Switzerland. *See* Media Release, Holcim (July 10, 2015), http://bit.ly/HolcimLafargePressRelease.

4.      Lafarge and LCS have already admitted liability. On October 18, 2022, the Department of Justice announced its first-ever prosecution of a corporation for providing material support for terrorism. According to Deputy Attorney General Lisa O. Monaco, Lafarge and LCS "partnered with [ISIS], one of the most brutal terrorist organizations the world has ever known, to enhance profits and increase market share—all while ISIS engaged in a notorious campaign of violence during the Syrian civil war."[2]

5.      As part of their plea agreement, Lafarge and LCS agreed to a 52-page Statement of Facts detailing their unlawful conduct ("Statement of Facts"). *See* Statement of Facts, *United States v. Lafarge S.A. et al.*, No. 1:22-cr-00444 (E.D.N.Y. Oct. 18, 2022), ECF No. 10-1. Additionally, Lafarge and LCS agreed in their guilty plea that "they will not dispute the Statement of Facts…" Plea Agreement at ¶ 13, *id.*, ECF No. 10. Plaintiffs incorporate the Statement of Facts and guilty plea into this Complaint in their entirety.

6.      In the Statement of Facts, Lafarge and LCS made a series of factual admissions establishing their criminal liability under the ATA's criminal provisions, specifically 18 U.S.C. § 2339B(a)(1), which prohibits providing "material support or resources" to an FTO.[3]

7.      Those factual admissions demonstrate that—at the specific direction of the companies' highest management levels, including the CEOs of both Lafarge and LCS—Defendants entered into numerous types of arrangements with ISIS for the express purpose of promoting Defendants' security and economic interest and incentivizing ISIS to protect those interests.

---

[2]     Press Release, U.S. Dep't of Justice (Oct. 18, 2022), https://www.justice.gov/opa/pr/lafarge-pleads-guilty-conspiring-provide-material-support-foreign-terrorist-organizations.

[3]     Lafarge Cyprus is the direct subsidiary of Lafarge through which Lafarge held nearly all of its shares in LCS. Lafarge and LCS's factual admissions also, logically, apply to Lafarge Cyprus.

8.    Defendants agreed to, and did, make monthly protection payments to ISIS to protect LCS employees, to ensure the Cement Plant's continued operation, and to obtain economic advantage over their competitors in the Syrian cement market. Defendants also agreed to, and did, purchase raw materials from ISIS-controlled suppliers who paid ISIS based on the amount of their sales to LCS and also paid ISIS based on the volume of cement LCS sold.

9.    In exchange, and as part of the conspiracy, ISIS permitted Defendants to access raw materials sourced from its territory, permitted LCS's employees, suppliers, and customer-distributors to pass safely through ISIS-controlled territory, and even agreed to impose costs on, and, in some cases, block the importation of competing cement from Turkey.

10.    Defendants worked with ISIS expressly for their own financial gain—to protect their investment, profit during the Syrian civil war, and position Defendants to benefit opportunistically from the effort to rebuild Syria following the cessation of hostilities.

11.    Indeed, Defendants referred to their "profit" as a "cake," and they were happy to "share" a slice with ISIS so long as ISIS continued to protect and enhance Defendants' economic interests.

12.    ISIS, of course, also benefitted handsomely and used the millions of dollars received from Defendants to fund their violent terrorist activities, including the Attack which killed or injured Plaintiffs.

13.    Defendants were fully aware that they were in business with terrorists and that their conduct flagrantly violated U.S. law. Indeed, Defendants' executives frequently communicated about the challenges of dealing with armed militants who were "classified as terrorists by international organizations and the US."[4]

---

[4]    All citations to written correspondence include original spelling, punctuation, and grammar.

14.    To avoid detection, Defendants went to great lengths to conceal their relationship with ISIS. For example, Defendants preferred to work through intermediaries. As one LCS security consultant admitted, "it was especially important that the relationship would be handled by [intermediaries], since an exposure of this sort would have been compromising for LCS. But via [intermediaries], we did in fact contribute to the economy of ISIS." Relatedly, LCS executives ensured that documents regarding terrorist payments did not reference the word "Lafarge." For example, LCS's CEO instructed an intermediary that "the name of Lafarge should never appear for obvious reasons in any documents of this nature. Please use the words Cement Plant if you need but never the one of Lafarge." In addition, Lafarge executives used personal email addresses—rather than Lafarge email addresses—to communicate about their dealings with ISIS, and one Lafarge in-house counsel stated that "he preferred not to receive anything by email."

15.    Defendants have specifically admitted to paying the equivalent of at least $5.92 million to ISIS and the designated FTO terrorist group Al-Nusra Front ("ANF") from 2012 through 2014. These payments consisted of at least $816,000 of monthly "donations" to ISIS; at least $3,447,528 in payments to ISIS-controlled suppliers; and at least $1,654,466 in profit-sharing payments based on the amount of cement LCS sold. When ISIS ultimately seized the Cement Plant in September 2014, ISIS stole cement that LCS had produced in furtherance of the conspiracy, and ISIS sold the cement at prices that would have yielded ISIS another $3.21 million.

16.    Those same factual admissions also give rise to civil liability under the ATA, 18 U.S.C. § 2333, including as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. 114-222, 130 Stat. 852.

17.    Based on the heinous conduct underlying their guilty plea, U.S. District Judge William F. Kuntz II sentenced Lafarge and LCS to terms of probation and to pay financial

penalties, including criminal fines and forfeiture, totaling $777.78 million. At the conclusion of the sentencing hearing, Judge Kuntz said: "This case impacts global communities. This case impacts the national security of the United States. This case impacts the victims of terrorist acts perpetrated by ISIS and ANF."

18.     Plaintiffs are victims of a terrorist attack perpetrated by ISIS.  Under the ATA, they are entitled to recover for their economic loss, physical pain and suffering, and the severe mental anguish and extreme emotional pain and suffering stemming from the loss of their relatives' society, companionship, comfort, protection, attention, advice, and counsel that they experienced as a result of a March 19, 2016, ISIS Attack.

## THE PARTIES

### A.    Plaintiffs

19.     Plaintiffs are survivors, estates, or heirs, of U.S. nationals killed or wounded by an ISIS suicide bomber in an attack in Istanbul, Turkey, on March 19, 2016. The specific plaintiffs and the attack at issue are described below in Part VII.

### B.    Defendants

20.     Defendant Lafarge S.A. is the parent company of a multinational building materials business, which is organized under the laws of France and headquartered in Paris, France. At pertinent times, Lafarge, together with its subsidiaries, employed 63,000 people to manufacture and sell cement, construction aggregates, concrete, and other building materials at 1,612 production sites in approximately 61 countries, including the United States. On July 10, 2015, Lafarge merged with its leading competitor, Holcim Ltd. ("Holcim"), a Zurich, Switzerland-based building materials business. At the time of the merger, Holcim and Lafarge were the two largest multinational building materials companies in the world.

21.     Defendant Lafarge Cement Holding Limited ("Lafarge Cyprus") is a direct subsidiary of Lafarge. It is organized under the laws of Cyprus and headquartered in Cyprus. Lafarge Cyprus was the entity through which Lafarge held nearly all its shares in Lafarge Cement Syria S.A. until Lafarge and its subsidiaries merged with Holcim in 2015.

22.     Defendant Lafarge Syria, S.A. was an indirect subsidiary of Lafarge, organized under the laws of Syria and headquartered in Damascus, Syria. Lafarge indirectly owned 98.7% of LCS through four subsidiaries, including Lafarge Cyprus. From approximately May 2010 to September 2014, Lafarge, through LCS, operated a cement plant in the Jalabiyeh region of Syria, located in northern Syria near the Turkish border and between the cities of Manbij and Raqqah, Syria.

23.     Each Defendant played a culpable role in providing this material support to ISIS and ANF. When Plaintiffs refer below to "Defendants" or to "Lafarge" making payments, they mean that all three corporate affiliates cooperated to facilitate the payments. For ease of reference, this Complaint does not repeat each Defendant's individual role every time it describes their conduct. Their roles generally remained consistent throughout the alleged course of conduct.

24.     Although not parties to the Complaint, certain individuals feature prominently in the Statement of Facts as Executive 1-6, Intermediary 1 and 2, and In-House Lawyer 1, and are themselves co-conspirators with ISIS.

25.     On information and belief, Intermediary 1 is Firas Tlass, a citizen and national of Syria and the son of the country's longtime Minister of Defense, Mustafa Tlass. He was a minority shareholder in LCS until the Syrian regime confiscated his shares in or about 2012. LCS, with Lafarge's knowledge and approval, paid Tlass to negotiate with and deliver payments to terrorist groups, including ISIS and ANF.

26.     Also on information and belief, Intermediary 2 is Amro Taleb, a citizen of Canada and Syria and a former consultant to LCS who acted as Defendants' agent in sourcing raw materials from ISIS-linked suppliers. LCS, with Lafarge and Lafarge Cyprus's approval, paid Taleb to negotiate with and pay ISIS.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2333, and 18 U.S.C. § 2338, as a civil action brought by nationals of the United States who were killed or injured by reason of acts of international terrorism, and their estates, survivors, and heirs.

28.     Defendants are subject to personal jurisdiction, pursuant to 18 U.S.C. § 2334(a), New York Civil Practice Law and Rules § 302(1), and Federal Rule of Civil Procedure 4(k)(1)(A), because, as discussed further below, they have transacted business and committed tortious acts within the United States (and New York) by engaging in U.S. dollar-denominated transactions processed through New York banks for the benefit of the FTO ISIS.

29.     Personal jurisdiction also exists under Federal Rule of Civil Procedure 4(k)(2) because Defendants' executives regularly used personal email accounts serviced by U.S.-based email service providers, instead of their corporate email addresses, to coordinate and carry out elements of their conspiracy with ISIS, while attempting to conceal their conduct from auditors and authorities.

30.     Personal jurisdiction also exists under Federal Rule of Civil Procedure 4(k)(2) because Defendants participated in a conspiracy with ISIS, whose actions were at all relevant times directed at the United States, including the killing of Americans.

31.     Defendants are also subject to personal jurisdiction given their participation in a conspiracy with ISIS, whose actions were at all relevant times directed at the United States, including the killing of Americans.

32.     Venue in this district is proper pursuant to 28 U.S.C. §§ 1391(b), (c), and (d) and 18 U.S.C. § 2334(a).

## FACTUAL ALLEGATIONS

### I.     ISIS Is An Infamously Violent Foreign Terrorist Organization.

#### A.     ISIS Is A Designated FTO.

33.     On October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid Wa'al-Jihad, as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under Executive Order 13224.[5]

34.     On December 11, 2012, the United States amended the FTO and Executive Order designations for AQI to include ANF, under the new aliases: Al-Nusrah Front, Jabhat Al-Nusrah, Jabhet Al-Nusra, The Victory Front, and Al Nusrah Front for the People of the Levant. In its accompanying press release, the Department of State warned that ANF "has sought to portray itself as part of the legitimate Syrian opposition while it is, in fact, an attempt by AQI to hijack the struggles of the Syrian people for its own malign purposes."[6]

35.     On May 14, 2014, the Secretary of State amended the FTO designation of AQI to add the alias Islamic State of Iraq and the Levant as the primary name of AQI and remove aliases associated with ANF. The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and Al-Sham, The Islamic State of Iraq and Syria ("ISIS") (which is how

---

[5]     Press Statement, U.S. Department of State, Foreign Terrorist Organization: Designation of Jama'at al-Tawhid wa'al-Jihad and Aliases (Oct. 15, 2004), *available at* https://2001-2009.state.gov/r/pa/prs/ps/2004/37130.htm.

[6]     Press Statement, U.S. Department of State, Terrorist Designations of the al-Nusrah Front as an Alias for al-Qa'ida in Iraq (Dec. 11, 2012), https://2009-2017.state.gov/r/pa/prs/ps/2012/12/201759.htm.

the FTO is referenced in this Complaint), ad-Dawla Al- Islamiyya fi Al-Iraq wa-sh-Sham, Daesh, Dawla Al Islamiya, and Al-Furquan Establishment for Media Production. ISIS remains a designated FTO to this day.[7]

**B.    ISIS Was Founded By Al Qaeda In Iraq.**

36.    In October 2004, Abu Musab al-Zarqawi, after negotiations between his Kurdish Islamist Group and Al-Qaeda, pledged allegiance to Al-Qaeda, forming a new group known as Al-Qaeda in Iraq or AQI.

37.    AQI launched waves of attacks, including suicide bombings, against the U.S. civilians and contractors, military, security forces, government institutions, and other civilians, particularly the Shi'ite population.

38.    Zarqawi also welcomed many foreign fighters in his forces, as ISIS would many years later.

39.    The United States killed Zarqawi in June 2006, and Abu Omar al-Baghdadi became the leader of AQI.

40.    Abu Omar al-Baghdadi merged AQI with other groups and, in October 2006, renamed the terrorist group as the Islamic State of Iraq ("ISI"), although media reporting would still often refer to the group as AQI. ISI took root primarily in western Iraq and, at that time, committed attacks mainly against U.S. armed forces and the Shi'ite affiliated Iraqi government.

41.    In 2010, Abu Bakr al-Baghdadi became ISI's leader.  He led ISI's expansion into Syria and oversaw its ultimate renaming to ISIS.  Towards the end of the American presence in

---

[7]    Press Statement, U.S. Dep't of State, Terrorist Designations of Groups Operating in Syria (May 14, 2014), https://2009-2017.state.gov/r/pa/prs/ps/2014/05/226067.htm.

Iraq, and shortly after the American withdrawal from Iraq, ISI was largely weakened. But the civil war that broke out in Syria in March 2011 made Syria fertile ground for ISI's spread to Syria.

42.     The Syrian conflict began in March 2011 as an uprising against the regime of President Bashar al-Assad. In Aleppo governorate, where the Cement Factory had begun to operate less than a year prior, mass protests first erupted in August 2011. These protests, in Aleppo city, were brutally suppressed by government forces.[8]

43.     At the end of 2011, ISI sent skilled fighters to Syria to participate in the uprising against the Assad regime. Seeing an opportunity in Syria, ISI established the Al-Nusra Front ("support front"), a jihadi organization headed by Abu Muhammad Al-Julani. Al Julani was appointed the commander of ANF, ISI's Syrian branch, and was initially subordinate to Abu Bakr al-Baghdadi.

44.     ANF spread terror throughout Syria. Its first operation was a massive suicide bombing in Damascus, which killed more than forty people in December 2011.[9] Its second operation was another suicide bombing in Damascus, killing 26. Throughout 2012, ANF remained a small cell-based terror organization, but its influence continued to grow as conflict in Syria continued to intensify. ANF allied with armed opposition groups and began winning a series of military victories against Assad's forces.

---

[8]     Nour Ali, *Syria violence spreads to commercial capital Aleppo*, The Guardian (Aug. 12, 2011), *available at* https://www.theguardian.com/world/2011/aug/12/syria-violence-spreads-aleppo.

[9]     Charles Lister, The Brookings Project on U.S. Relations with the Islamic World, No. 24, Profiling Jabhat al-Nusra (July 2016) https://www.brookings.edu/wp-content/uploads/2016/07/iwr_20160728_profiling_nusra.pdf.

45.     In April 2013, Abu Bakr al-Baghdadi announced that ANF and ISI were united into one cross-regional jihadist enterprise to be known as Al-Dawlah Al-Islamiyah fi Al-'Iraq wa Al-Sham (The Islamic State of Iraq and Levant – called ISIL or, alternatively, "ISIS").

46.     Abu Muhammad al-Julani refused to subordinate himself to al-Baghdadi and quickly swore allegiance to Al-Qaeda leader Ayman al-Zawahiri. In early June 2013, al-Zawahiri, in a communiqué published in al Jazeera stated the al-Baghdadi was "wrong when he announced the Islamic State in Iraq and the Levant without asking permission or receiving advice from us [AQ]" and al-Julani was "wrong by announcing his rejection of the Islamic State in Iraq and the Levant, and by showing his links to al-Qaeda without having our permission or advice."  Al-Zawahiri thereby ordered both ISI and ANF each back to their respective geographically delimited territories of Iraq and Syria. On January 3, 2014, al-Zawahiri announced he had severed all connections with ISIS and that ISIS was no longer a branch of Al-Qaeda.

47.     In February 2014, ISIS issued a public statement attacking the Al-Qaeda leadership and ANF. Abu Muhammad al-Adnani, a senior ISIS figure and its spokesman, accused the Al-Qaeda leadership of "straying from the correct path." The split between the Al-Qaeda leadership and ISIS thus became open. Since then, ANF has been operating in Syria independently, while ISIS operates both in Syria and in Iraq, its home countries and power base.[10]

**C.    ISIS Engages In Notoriously Horrific Brutality.**

48.     During the time Defendants operated the Cement Plant, ISIS seized and solidified control of territory in Syria often by using terror to amplify its dominance, with its media arm

---

[10]    Meit Amir Intelligence and Terrorism Information Center, ISIS: Portrait of a Jihadi Terrorist Organization, (Nov. 2014), at 33, *available at* https://www.terrorism-info.org.il//Data/articles/Art_20733/101_14_Ef_1329270214.pdf.

producing and releasing sophisticated videos of scenes of egregious violence, often including executions.

49.    Many of ISIS's brutal acts occurred in Aleppo governorate, where the Cement Plant was located, or in nearby Raqqah.[11] Indeed, by late spring 2013, ISIS had strongholds in northern Syria within a short distance of the Cement Plant, including in Raqqa, al-Bab, Jarablus, Atarib, and Minbej.[12]

50.    Contemporaneous and often well-publicized accounts describe ISIS's extreme brutality, to include mass executions, beheadings and amputations, and waves of atrocities against marginalized communities including women, religious and ethnic minorities, and sexual and gender minorities.[13]

51.    In its August 2014 report, the UN Syria Commission determined that, between January and July 2014, members of ISIS had "committed torture, murder, acts tantamount to enforced disappearance, and forcible displacement as part of an attack on the civilian population in Aleppo and Ar Raqqah governorates, amounting to crimes against humanity." The report also documents ISIS committing war crimes, including murder, execution without due process, torture, hostage-taking, violations of international humanitarian law tantamount to enforced disappearance, rape and sexual violence, recruiting and using children in hostilities, and attacking protected objects.[14]

---

[11]    Report on ISIL in Syria and Iraq, The Center for Justice & Accountability (July 8, 2021), at 12-19, http://cja.org/wp-content/uploads/2021/10/ISIL-in-Syria-and-Iraq-Report.English.2021.07.09-2.pdf.

[12]    *Id.* at 9.

[13]    *Id.* at 11.

[14]    *Id.* (citing and quoting Report of the independent international commission of inquiry on the Syrian Arab Republic, U.N. General Assembly, Human Rights Council (Aug. 13, 2014), *available at* https://bit.ly/3SDZ98a).

52.     In June 2013, ISIS executed a 14-year-old boy in Aleppo city, for blasphemy, shooting him in the head and neck with an automatic rifle in front of a crowd that included his mother and father.

53.     Also in June 2013, ISIS abducted two 15-year-old boys near Nubul. They were executed in August 2013, and their corpses were mutilated almost beyond recognition. ISIS posted a video of the execution on the internet shortly afterwards.

54.     In nearby Raqqah city, between March and July 2013, hundreds of people were abducted. Some of their bodies were later found, the obvious victims of torture and murder.

55.     As the UN reported, from January to June 2014, executions were a "common spectacle on Fridays in Ar Raqqah and ISIS-controlled areas of Aleppo governorate… Bodies are placed on public display, often on crucifixes, for up to three days, serving as a warning to local residents."

56.     The UN found that these executions were also occurring in Minbij, only tens of kilometers away from the Cement Plan. The UN wrote, "In Minbij, ISIS uses a parking lot as its execution site. Most executions are beheadings." The UN also found that, in February 2014, a 15 year old boy was beheaded and the body left on the ground for two days. Also in Minbij, in April 2014, ISIS beheaded two men and displayed their bodies on crucifixes for two days.

57.     ISIS's public executions and crucifixions were widely publicized at the time, including by CNN, BBC, the Telegraph, Vice, and the French news outlet, La Croix.

58.     ISIS also used the harsh punishment of amputation as a terror tactic to control the population.

59.     The UN also found that "public squares have become the scene of amputations, lashings and mock crucifixion in Ar Raqqah governorate, as well as in Minbij (Aleppo)."

60.     In late February 2014, ISIS live-tweeted its amputation of a man's hand in a public square in Maskaneh, which is within the Aleppo governorate. The Washington Post reported on the story.

61.     In 2013, Amnesty International released a report describing how ISIS operated seven detention centers across Raqqah and Aleppo governorates, where it detained children as young as eight years old. The report described ISIS's horrific abuses, including torturing prisoners by flogging them with rubber generator belts or cables or administering electric shocks.[15]

62.     Women and girls suffered extraordinarily under ISIS. The UN found ISIS forced Sunni women and girls to marry its fighters, some of whom were found to engage in horrific physical and sexual abuse. Moreover, ISIS removed women and girls from public life, placing them entirely under the control of male relatives and requiring that women over the age of 10 must be entirely covered in public and could not travel without a close male relative. Relatedly, the UN identified incidents of women being stoned to death.[16]

63.     ISIS also abducted and killed aid workers, for example in the fall of 2014, beheading one American and two British aid workers on video.[17]

64.     ISIS also abducted and killed journalists. In October and November 2013, journalists working for international television channels were killed in Aleppo. In August and September 2014, ISIS executed two American journalists.[18]

---

[15]     Amnesty International, *Syria: Rule of fear: ISIS abuses in detention in Northern Syria* (Dec. 19, 2013), *available at* https://www.amnesty.org/en/documents/mde24/063/2013/en/.

[16]     Report of the independent international commission of inquiry on the Syrian Arab Republic at 7.

[17]     ISIS: Portrait of a Jihadi Terrorist Organization at 249-56.

[18]     *Id.*

65.     According to an October 2014 article in the New York Times, during the prior year, at least 23 foreign nationals from 12 countries were abducted in Syria, often by ISIS itself or by others and later transferred to ISIS.[19]

**D.    Foreign Fighters, Including Turkish Jihadists, Join ISIS.**

66.     Thousands of foreign fighters traveled to Syria and Iraq to join ISIS, with one November 2014 report estimating the number at approximately 13,000.[20]

67.     Thousands of Turkish jihadists reportedly traveled to Syria to join extremist groups between 2013 and late 2014, some under the pretense of doing humanitarian work.[21]

68.     According to an analysis by West Point of more than 4,600 ISIS personnel records dated between early 2013 and late 2014, 93 percent of the foreign fighters listed in those records entered Syria through six different border towns in Turkey.[22]

69.     Throughout the fall of 2014, Turkish newspapers reported often on ISIS activities in large Turkish cities like Gaziantep, a city on the border with Syria and the home of the suicide bomber who committed the Attack on Plaintiffs.[23]

---

[19]     *Id.* at 247.

[20]     *Id.* at 163.

[21]     Turkey's Jihadists," *Turkey Wonk: Nuclear and Political Musings in Turkey and Beyond,* Apr. 28, 2015, https://turkeywonk.wordpress.com/2015/04/28/turkeys-jihadists/; "Turkish police detain 28 in anti-al-Qaeda op, raid on İHH office," *Hurriyet Daily News (Turkey)*, January 14, 2014, https://www.hurriyetdailynews.com/turkish-police-detain-28-in-anti-al-qaeda-op-raid-on-ihh-office-61000.

[22]     Combatting Terrorism Center, West Point, "Then and Now: Comparing The Flow of Foreign Fighters to AQI, and the Islamic State," https://ctc.westpoint.edu/wp-content/uploads/2016/12/Then-and-Now.pdf.

[23]     Looking for ISIL: How jihadists operate among Turks, *Hurriyet Daily News* (Turkey) (July 22, 2015), https://www.hurriyetdailynews.com/looking-for-isil-how-jihadists-operate-among-turks-72054.

70.    According to a Turkish police and security unit's reports from July 2016, a 60-person core cadre of ISIS inside Turkey were operating along the Istanbul-Sanliurfa-Gaziantep-Hatay-Batman-Adiyaman-Kahramanmaras area. This core group has been professionally trained abroad for establishing cells and planning attacks.[24]

71.    The ISIS network in Gaziantep, notably, has been raided by police numerous times, with large quantities of suicide vests confiscated in the operations during 2016[25] and 2017.[26]

72.    ISIS also exported its violent message to the broader Muslim world establishing Jihadi networks in Libya, Saudi Arabia, Yemen, Algeria, Nigeria, and beyond.[27]

73.    ISIS has also expanded beyond the Arab World. It has conducted terrorist attacks in France, Belgium, Germany, the United Kingdom, Turkey, Bangladesh, Spain, and many other countries around the world.[28]

---

[24]    Metehan Demir, Rakamlarla IŞİD'in Türkiye'de tüyler ürperten varlığı (The chilling presence of ISIS in Turkey, by the numbers), *Super Haber (Turkey)*, July 1, 2016, http://www.superhaber.tv/dunya/rakamlarla-isidin-turkiyede-tuyler-urperten-varligi/haber-10824 (translated using Google translate).

[25]    ISIL member blows himself up during Turkish police raid, *Al Jazeera*, May 20, 2016, http://www.aljazeera.com/news/2016/05/isil-member-blows-turkish-police-raid-160520090343990.html; Fevzi Kizilkoyun, ISIL militants prepared suicide vests in Gaziantep on Syrian border: Police, *Hurriyet Daily News (Turkey)*, Dec. 5, 2015, http://www.hürriyetdailynews.com/isil-militants-preparedsuicide-vests-in-gaziantep-on-syrian-border-police.aspx?pageID=238&nID=92101&NewsCatID=509.

[26]    Police detain four ISIL suspects, foil terrorist attack in Turkey's Gaziantep, *Hurriyet Daily News (Turkey)*, Feb. 9, 2017, https://www.hurriyetdailynews.com/police-detain-four-isil-suspects-foil-terrorist-attack-in-turkeys-gaziantep-109525.

[27]    U.S. Institute of Peace, The Jihadi Threat (Dec. 2016 / Jan. 2017), at 17, *available at* https://www.usip.org/sites/default/files/The-Jihadi-Threat-ISIS-Al-Qaeda-and-Beyond.pdf.

[28]    Council of Europe, Parliamentary Assembly, Funding of the terrorist group Daesh: lessons learned (Mar. 12, 2018), *available at* http://bit.ly/3Y7Puru.

74.     Indeed, foreign fighters returning home from Iraq and Syria are often the impetus for establishing or reviving terror networks that conduct these terror attacks.[29]

### E.    ISIS Has Numerous Funding Sources, Including Syrian Cement Plants.

75.     ISIS funds its reign of terror by selling oil, looting banks, selling illegal drugs and stolen artifacts, kidnapping for ransom, and extorting local civilians and businesses through "taxes."[30]

76.     ISIS also gained control over five major cement plans in Syria and Iraq, including the Cement Plant at issue here.

77.     According to one estimate, ISIS was able to earn approximately $292 million from cement in 2014.[31]

78.     The Cement Plant, and the payments received from LaFarge, were therefore a critical source of funding that enabled ISIS's reign of terror, including the March 19, 2016, terror attack that killed and injured Plaintiffs.

## II.    Defendants Provided Material Support To ISIS.

### A.    Defendants Partner With ISIS.

79.     In 2007, Lafarge acquired Egyptian cement multinational Orascom Cement for $12.81 billion. As part of the deal, Lafarge stated that "the acquisition would give it a leading position in the Middle East and Mediterranean basin."[32]

---

[29]     Council of Europe, Parliamentary Assembly, Foreign fighters in Syria and Iraq (Jan. 8, 2016), *available at* http://bit.ly/3Z813jT.

[30]     Money Matters: Sources of ISIS' Funding and How to Disrupt Them, Centre for Geopolitics & Security in Realism Studies, http://cgsrs.org/publications/27.

[31]     Council of Europe, Parliamentary Assembly, Funding of the terrorist group Daesh: lessons learned (Mar. 12, 2018), *available at* http://bit.ly/3Y7Puru.

[32]     Reuters, Lafarge to Buy Orascom Cement for $12.8 Billion (Dec. 10, 2007), https://www.cnbc.com/id/22178287.

80.    Lafarge and LCS completed the construction of the Cement Plant at the significant cost of $680 million, and the plant opened in May 2010.

81.    From the beginning of LCS's operations, it faced strong competition from cheaper cement imported into northern Syria from Turkey. To address this issue, in December 2010, Executive 3 (LCS's CEO) requested that then-minority shareholder Intermediary 1, a Syrian citizen with close connections to the Syrian regime and local groups, intervene with the Syrian government to curtail the importation of competing Turkish cement.

82.    In March 2011, however, an uprising began against the regime of Syrian President Bashar al-Assad, which began to spread across Syria, including, by August 2011, to the Aleppo governorate, where the Cement Plant was located.

83.    In response, in September 2011, the European Union barred its member states from buying, importing, and/or transporting oil and other petroleum products from Syria, and from entering into financial or insurance services for such transactions. The United States forbade import of its products into Syria, embargoed Syrian oil, and froze the assets of several Syrian individuals. In December 2011, the United Nations Office of the High Commissioner for Human Rights declared that Syria was in a state of civil war.

84.    As a result of these sanctions, and the U.N.'s declaration, multinational corporations exited Syria, including, in December 2011, two of the largest oil companies in the world, Royal Dutch Shell and the French conglomerate, Total S.A.. By contrast, Defendants continued to operate in Syria.

85.    In 2012, ISIS and ANF gained control of territory in Syria and committed numerous terrorist acts, resulting in the deaths of numerous U.S. citizens, including through graphic and well-publicized beheadings.

86.     By May 2012, the conflict spread to the area immediately surrounding the Cement Plant—indeed, LCS employees were being kidnapped and LCS trucks were being hijacked.

87.     Defendants knew of the risks of violence to suppliers and partially evacuated. Defendants evacuated foreign employees from Syria and moved LCS's headquarters to Cairo, from Damascus. However, LCS's non-Syrian employees continued to operate the plant under the direction of LCS's management in Cairo.

88.     Starting in the summer of 2012, Defendants began negotiating, through intermediaries, with various armed factions in the Syrian civil war. By November 2012, ANF's presence in the region grew and LCS engaged directly with them, knowing full well that ANF was a designated FTO that was "similar to al-Qaida."

89.     Defendants nonetheless continued with their plan, which Executive 3 (LCS's CEO) described to Executive 2 (Lafarge's Executive Vice President of Operations) as follows:

> [p]reserving the integrity of our physical assets (avoiding the plant to be looted), keeping our personnel ready for the end of the crisis (knowing the huge investment we have made in terms of recruitment and competency development), staying in the market (to keep our distributors' network and to prevent to let Turkish imports flooding North and East of Syria), making some profit to  at least repay the interests of the loan and giving some assurance to the lenders.

90.     On September 23, 2012, Executive 1 and Intermediary 1 met in Gaziantep, Turkey, with representatives of armed militants in areas surrounding the Cement Plant. Intermediary 1 recommended that LCS make payments to each of the armed militias based on the quantity of cement produced or according to the monthly fee. Notably, the meeting took place in Gaziantep, a key, Turkish city near the Syrian border with ties to ISIS, and the home of the terrorist who committed the Attack against the Plaintiffs.

91.    By November 2012, Lafarge and LCS executives had approved a plan to establish relations with ANF through Intermediary 1. On November 11, 2012, Intermediary 1 notified Executive 3 that LCS was engaging directly with ANF: "gazi entab [Gaziantep, Turkey] was good we have now conextion with jabhat al nosra [ANF]."

92.    By March 2013, ISIS, ANF, and other armed groups had taken over the area around Raqqah and both groups quickly established checkpoints at access roads to the Cement Plant. ISIS and ANF guarded their checkpoints with snipers, rockets, and homemade artillery.

93.    On April 7, 2013, Intermediary 1 recommended that LCS executives instructed Intermediary 1 to negotiate an agreement to pay ANF monthly or by the truckload to ensure continued access to the plant.

94.    Several months later, on August 30, 2013, Executive 3 reported to Executive 1 (Lafarge Vice President of Security) and Executive 2: "It is clear that we have an issue with ISIS and Al Nusra and we have asked our partner [Intermediary 1] to work on it."

95.    Lafarge and LCS executives were fully aware at the time that they were dealing with terrorist organizations and proposing to providing illegal funding for FTOs and designated terrorists in violation of US sanctions.

96.    For example, in a December 20, 2012 email, Executive 1 wrote: "The Islamist group Jabhat Al-Nusra, which is on USA's list of terrorist organisations, has reportedly recruited several Norwegian citizens to fight in Syria."

97.    Similarly, in a March 1, 2013, email, LCS's risk manager warned Executive 3 that ANF "follow[s] a global jihadi ideology (similar to al-Qaida) and are more open to receive foreign fighters" and had "ties to al-Qaeda, exemplified by participating al-Qaida veterans, mainly from Iraq, and . . . some of their statements are quickly published in the main al-Qaida news outlet."

98.     Likewise, notes from a September 11, 2013, meeting of Lafarge's Security Committee, which Executive 1 and Executive 2 received, stated: "It gets harder and harder to operate without having to directly or indirectly negotiate with networks classified as terrorists by international organizations and the US. The main challenge being to assess how far their demands and threats will reach, and consequently, the limits that we want to impose for the site to operate."

99.     Despite this knowledge, Defendants decided to conspire with and enter into a partnership with known and designated terrorists targeting Americans and the United States to enhance profits for themselves and ISIS and increase their joint market share by bribing ISIS to restrict LCS's competitors.

**B.     Lafarge And LCS Begin Making Payments To Terrorists.**

100.     Recognizing that ISIS "demand[ed] that a tax [fixed and profit-share payments] be paid," Lafarge and LCS proceeded to make millions of dollars in unlawful payments to terrorists. These payments came primarily through four mechanisms: (1) payments per truckload; (2) payments based on cement sold; (3) donations; and (4) fixed monthly "security" payments.

**1.     Defendants pay terrorists $150 per truck to pass through checkpoints.**

101.     On August 26, 2013, Executive 3 emailed Intermediary 1 a map of the area around the plant and summarized the "strong improvement" "[o]n the west side of the plant towards Menbij, Al Bab, Aleppo, Idlib," but highlighted that "[o]n the east side of the plant towards Hassakeh and Qamishli, [t]here are 2 check points held by jihadists (see the map) which are blocking the trucks to go to and from the plants," and "[o]n the south of the plant, in the region of Al Thawra, Raqqah, Sokhna: there is a check point held by jihadists between Al Thawra and Raqqah and also potential problems at Sokhna." Executive 3 summarized the problem by stating

"[g]enerally speaking, it is clear we have an issue with ISIS and Al Nusra in the east, especially in Raqqah."

102.    Intermediary 1 responded, "no probleme let me work on it today . . . i cal u tomorrow to breef you." The next day Intermediary 1 emailed Executive 3, "We Negotiate with (DAWLET AL IRAQ WAL SHAM) [ISIS] AL ISLAMIA & AL NUSRA I got a News that the situation In the Plant is Very Good."

103.    The situation was "Very Good" because, by October, Lafarge began paying safe-passage money directly to ANF and ISIS to ensure they would permit trucks to pass. In early September 2013, Executive 3 asked Intermediary 1 for updates regarding truck passage to the east of the plant, and Intermediary 1 responded, "better now Al Nusra do not obstruct Lafarge trucks ever as long as we pay them . . ." and on October 14, 2013, an LCS risk manager reported to Executive 1 that "our customer has reached long term agreements with leading groups Islamic State in Iraq and al-Sham (ISIS) in Raqqa, the agreement let the trucks coming back and forth from the east side of the plant. Each cement truck has to pay 150$."

**2.    LCS pays ISIS based on cement sold.**

104.    As part of a separate agreement, LCS paid ISIS based on the amount of cement that it sold. This agreement, dated November 6, 2013, and on ISIS letterhead, was between ISIS and LCS. The agreement stated that ISIS would assess trucks 400 Syrian pounds[33] for each transported ton of cement, and in exchange, ISIS would ensure the safety and free access of the trucks to the cement plant.

---

[33]    At this time, the exchange rate of Syrian pounds to U.S. dollars was approximately 112 to 1.

105.    Additionally, an ISIS vehicle pass dated April 26, 2014, and bearing ISIS's letterhead and stamp, allowed LCS employees to "pass through after the required work. This is after they have fulfilled their dues to us."

### 3.    LCS makes "donations" to ISIS.

106.    LCS also made fixed monthly "donation" payments through Intermediary 1 to ISIS and ANF.

107.    These payments began as early as July 2012. By February 2013, at Executive 3's request, Intermediary 1 had begun periodically providing lists identifying the armed groups to which he was making payments on LCS's behalf and the amounts he was paying to the groups each month.

108.    Beginning in February 2013 and continuing through at least July 31, 2013, Intermediary 1 advised Executive 3 that he was making payments of 200,000 Syrian pounds at first, and later 325,000 Syrian pounds per month to a group he identified as the "ALRAQA People," which was a reference to ANF.

109.    In a July 2, 2013, email with the subject line "Donations," Executive 3 calculated that the new total of monthly payments to armed factions was 17.4 million Syrian pounds.

110.    In an August 5, 2013, email with the subject line "Update on donations," Executive 3 wrote to Executive 2 that "some elements on the donations we[] are paying to [Intermediary 1] and that he is supposed to channel to the various beneficiaries. As discussed in Dubai end of May and as reminded in my recent mail to you and [Executive 5], these donations are distinct from the monthly remuneration of our partner."

### 4.    LCS pays fixed monthly security payments to ISIS.

111.    In November 2013, Lafarge and LCS executives decided that Intermediary 1 should make fixed monthly security payments to ISIS. In a November 29, 2013, email, Lafarge

and LCS executives exchanged a list of "donations we are paying to [Intermediary 1] and that he is supposed to channel to the various beneficiaries." The email contained a "List valid from November 1, 2013," which included a five million Syrian pound monthly payment for "Daesh (ISIS)."

112.    On February 4, 2014, Executive 3 directed Intermediary 1 to limit the monthly payments to armed groups to 20 million Syrian pounds, including limiting assessments on sales to 200 Syrian pounds per ton. Intermediary 1 responded that his representatives were meeting to discuss the payments with ISIS in Raqqah and with ANF in Aleppo.

113.    Following those meetings, Intermediary 1 advised LCS to increase payments to the terrorists. As Intermediary 1 explained in a March 31, 2014, email pointing out the extent of LCS's investment and the scope of its current profit:

> Is Lafarge able to bear a loss of about $600 million, because we are operating in a difficult situation? The second option is to endure bouts of anxiety and a sense of helplessness for a few moments (believe me, after every Skype with [PYD representative] or with Daich's [ISIS's] Amir Minbej or Raga my blood pressure rises to dangerous levels). Yet, I come back and say the loss will be greater for everyone. Even though I'm not completely comfortable in the relationship with Lafarge, I pressure myself to continue and I say tomorrow will be better for all of us, and we have to withstand two or three more years of unsettling circumstances. As long as we are selling and are able to overcome the obstacles, we should continue.
>
> Remember, we are dealing with militias that have a different thinking style than we do, and we are also dealing with the crazies on the other side
>
> I repeat, their logic is not like ours, but on my part, I have come to know all their keys and I am dealing with issues calmly, opening not shutting doors. I know I am jeopardizing my health, but prefer continuing with all the uncertainty which is better than stopping and losing everything. We currently sell for $8 to $10 million per month, with a $2 million profit, and pay less than 1/4 for protection. Other factories are paying for protection just to exist, without making the profits we are. One day, I will tell you

stories about the requests made by Daich or PYD,[34] carrying their rifles feeling like they own the world. At times I feel like a clown entertaining children!

They are all unsatisfied about us if we do what they want in this case we have to pay about 300 milion SYP monthly.

114.    LCS's monthly payments to terrorists allowed it to continue producing and selling cement at the Cement Plant into 2014, earning millions of dollars in profits for itself and its partner ISIS.

115.    On May 8, 2014, Intermediary 1 emailed LCS executives advising that LCS's operations were not impeded by local armed groups, stating "(Daesh — PYD — Al Nusra — Abu Issa[35] all we have good relations recently ...." LCS maintained "good relations" with these brutal terrorists by paying them ever increasing amounts.

116.    On September 15, 2014, LCS executives exchanged an email with Intermediary 1's initials as the subject line and containing two attachments. The first attachment was a document named "List of donations last version.pdf," which listed a monthly payment of 10 million Syrian Pounds to "Daesh" [ISIS] as of May 1, 2014.  In a second attachment to the email, titled "Evolution of the security donations 2012-2013-2014," Executive 3 listed, on top of the total amount of LCS's monthly "donation" payments, an additional "10 MSYP paid on April 23 to ISIS to unlock the West road."

### C.    LCS Purchases Materials From ISIS-Controlled Suppliers.

117.    In addition to making regular payments, LCS purchased materials from ISIS-controlled suppliers as part of its conspiracy with ISIS.

---

[34]    "Daich" and "Daesh" refer to ISIS. "PYD" refers to the Democratic Union Party in Syria, a Kurdish armed faction.

[35]    "Abu Issa" refers to Liwa' Thuwar Al-Raqqa, an armed militia participating in the Syrian civil war.

118.    As ISIS expanded its control over northern Syria, including quarries of materials LCS needed to continue to produce cement, LCS agreed to purchase raw materials from ISIS-controlled enterprises who paid ISIS based on the amount of their sales to LCS.

119.    On November 6, 2013, LCS and ISIS entered into a written agreement on ISIS letterhead providing that LCS would purchase pozzolana—a type of volcanic ash used to make blended cement—from ISIS for 1,300 Syrian pounds per ton. Under the agreement, ISIS would allow LCS's suppliers who mined and transported the pozzolana from ISIS-controlled quarries near Raqqah to retain some of LCS's payment for the raw material as profit.

120.    Also in late 2013, a Canadian-Syrian named Amro Intermediary 2, with whom LCS had previously worked on environmental licensing, explained to LCS's board that he wished to discuss "[t]he security issue of Lafarge ... in Syria. I build up strong relationships with civilian and Military Locals including FSA, Kurds and Islamic state which are in control of all logistic path in and out of ... Lafarge ...." Intermediary 2 repeatedly and explicitly identified ISIS as the seller of the raw materials that he brokered.

121.    For example, in a September 24, 2013, email about a recent order with the subject line "Urgent Fuel pozzolana Coal petcoke/Islamic state," Intermediary 2 informed LCS executives that LCS had already agreed to accept pozzolana sold by ISIS and stated, "FOR pozzolana 15000 tons ready to be shipped they are just waiting for signed P.O today max tomorrow please islamic state very sensitive about this issue."

122.    In a separate email chain a few days later, Executive 3 disputed the intermediary's assertion that LCS had already agreed to purchase, but nevertheless responded that "[a]fter my mail, our Purchasing team has contacted the contractor and the price is confirmed. We will place

an order early next week for a limited quantity (probably around 5,000 tons) as we need to see how it will work. If it is OK we will increase the quantity."

123.    As another example, in a September 28, 2013 email, Intermediary 2 declared, "I OFFICIALLY REPRESENT ISLAMIC STATE FOR INVESTMENTS and Soon for Kurdish. You ll get letter for that . So far im on LCS side but please Im asking kindly to have my Fees ."

124.    Lafarge and LCS executives understood that transacting with ISIS in this manner was illegal under U.S. and Syrian law. In a December 7, 2013 email, Executive 3 informed Executive 2 that the following activities likely violated Syrian government regulations: "Purchasing gypsum and pozzolana from rebellion," "Purchasing Heavy Fuel Oil from rebellion," and "Paying every month the various rebel entities." Nonetheless, Executive 3 determined that these activities were "needed for business continuity."

125.    Thus, with Defendants' blessing, Intermediary 1 and Intermediary 2 negotiated deals in which LCS purchased critical raw materials necessary to the operation of the Cement Plant, including coal, fuel, and pozzolana, from ISIS-controlled sources. In early 2014, LCS agreed to purchase massive amounts of material from ISIS- controlled suppliers, including 100,000 tons of pozzolana at 1,650 Syrian pounds per ton; another 100,000 tons of pozzolana at 1,675 Syrian pounds per ton; 4,000 tons of heavy fuel oil at 39,000 Syrian pounds per ton; another 12,000 tons of heavy fuel oil at 26,500 Syrian pounds per ton; 15,000 tons of "dirt" fuel at 17,500 Syrian pounds per ton; and an option for 35,000 additional tons of dirty fuel at the same price, as well as yellow sand and coal. Executive 3 reported these planned transactions to Lafarge executives and, on February 16, 2014, wrote to Executive 2 that the "situation with Daech (the jihadists of Islamic State in Iraq and Sham (ISIS)) is relatively calm and we are currently finalizing purchasing of pozzolana and fuel oil."

**D.    Lafarge And LCS Negotiate A Revenue Sharing And Market Control Agreement With ISIS.**

126.    In 2014, Lafarge and LCS executives negotiated a long-term revenue sharing and market control agreement with ISIS. The purpose was to use ISIS to block or tax competing cement imported from Turkey into Syria—increasing LCS's revenues, which LCS would then share with ISIS.

127.    Executive 3 proposed that ISIS should "take a 'toll fee' on each truck loaded with Turkish cement."  Such a toll would allow ISIS to gain revenue while simultaneously  "reduc[ing] the attractiveness of Turkish cement.  It would reinforce our competitiveness [and] therefore increase our volumes and increase the fees paid [to] our distributors or Da'ech [ISIS]."

128.    Lafarge and LCS executives expressed their commitment to revenue sharing with ISIS in the hope that it would incentivize the terrorist group to act in LCS's economic interest. According to a July 23, 2014 email that Executive 2 (Lafarge's Executive Vice President of Operations) wrote to Executive 3 and Executive 4, LCS's outgoing and incoming CEOs, LCS's profit should be thought of as a "cake" that could be shared with ISIS:

> We have to maintain the principle that we are ready to share the "cake," if there is a "cake." To me, the "cake" is anything that is a "profit", after the amortization and before financial expenses.
>
> Therefore, a tax by the ton is the only one that would make sense in this context.
>
> If we get a fixed tax, unless it's just a symbolic one, it would not make sense because they won't have a vested interest to have the plant run well.

129.    In August 2014, Intermediary 1 emailed Executive 4, LCS's new CEO, to inform him that ISIS wanted a monthly fee in addition to an assessment on each ton of cement sold:

> Negotiations with ISIS are complex and not easy at all. In their last request yesterday, they asked us to pay S.P.100 million/month, but I told them today morning that they will gain more than 100 million/month from the factory

in case the agreement includes the fixed monthly amount + the introduction amount + the amount of our purchases of pozolana, sand and fuel.

130.    Executive 4 responded: "If ISIS wants higher tax from us, it's better for them to stop Turkish cement and Iraki cement, so that we may increase the price." In response, Intermediary 1 said that ISIS was prepared to stop importation of Turkish cement upon consummation of a revenue sharing agreement.

131.    On August 5, 2014, Intermediary 1 sent Executive 4 a draft revenue-sharing agreement between LCS and ISIS. The next day, Executive 4 confirmed Lafarge's and LCS's agreement to a taxation rate of ten percent, in return for the free movement of LCS employees, customers and suppliers, as well as ISIS's agreement to stop importation of Turkish cement in areas under its control, for the following six months:

- As per our phone call today, hereafter what I understand from the agreement with ISIS, that I approve:

- ISIS will receive the payment of 750SP/ton, by customers, every two weeks

- ISIS ensures the security and the free movement of our customers and suppliers' vehicles as well as our employees

- ISIS will stop import of Turkish cement in the areas under its control (as of today: Al Rakka, Dair El Zor, Hasaka, Qamishli and Al Mayaden, Srin, Menbij, Al-Bab, Deir Hafer and Maskaneh), or implement in those areas taxes as high or higher than to Jalabieyeh cement plant.

- The agreement is valid until February 5th, 2015.

I hope the agreement to be signed today, and sales to restart tomorrow.

ISIS needs to clarify which office (AlRaqqah or Membij) is certified to receive payments and deliver permission letters.

132.    On or about August 15, 2014, Executive 4 recommended accepting ISIS's demands to facilitate cement sales on an urgent basis: "Currently, our stocks are full, and the

quantity of cement is deteriorating. So, all we can currently sell is welcome, especially if the battles intensify in the region next month. I recommend acceding to the request of ISIS."

133.    Executive 4 made this recommendation after being reminded by Executive 2 that, despite the operating agreement with ISIS, "we should not forget that ISIS is a terrorist movement."

134.    On August 15, 2014, the United Nations Security Council issued a resolution condemning ISIS, ANF, and Al-Qaeda, and calling on U.N. members to prohibit all financial and trade relations with the groups.

135.    On August 18, 2014, the United States Department of State added ISIS member Mohamed Al-Adnani and ANF member Said Arif to its list of Specially Designated Global Terrorists.

136.    These developments prompted concern from Lafarge and LCS executives. On August 18, 2014, Executive 1 emailed Executive 2 and Executive 4 with the subject heading "terrorist watch list" and wrote that the United States had designated ISIS's Al-Adnani and ANF's Arif to the list of Specially Designated Global Terrorists.

137.    Notwithstanding these designations, ISIS's well-publicized and ongoing terror activity (including the televised murder of Americans), and the international community's universal condemnation of the terrorist group, LCS finalized a revenue-sharing agreement with ISIS on or about August 20, 2014—after consulting with Lafarge's in-house counsel.

138.    Indeed, Executive 4 emailed Executive 1 and Executive 2 that he planned to consult with Lafarge's internal counsel regarding the latest negotiations with ISIS, which involved LCS's customers paying a fee to ISIS to access the Jalabiyeh Cement Plan rather than make direct payments to ISIS through an intermediary.

139.     On August 27, 2014, the Lafarge Executive Committee met. Notes from the meeting reflect that Executive 2 highlighted ISIS's agreement to impose costs on imported Turkish cement that were equal to the costs imposed on LCS: "In our agreement with Daesh [ISIS], we said that in terms of taxation we must have the same treatment as Turkish imports."

140.     The notes reflect that Executive 6, Lafarge's CEO, understood that Lafarge's agreement violated U.S. law: "we have to make sure that what we do is risk free (also vis-à-vis the U.S.)." In response, Executive 2 replied, according to those same notes, that "the best protection is to keep the plant in operation, sales have resumed, we are maintaining contact with everyone."

**E.    LCS Evacuates The Cement Plant.**

141.     On September 10, 2014, President Obama outlined a strategy for the United States to lead an international coalition to "degrade and ultimately destroy" ISIS through direct military action. President Obama described ISIS as "a terrorist organization, pure and simple" with "no vision other than the slaughter of all who stand in its way."

142.     Executive 4 nonetheless argued in favor of continuing Lafarge's and LCS's relationship with ISIS, saying that if LCS suspended operations "for the next few months until after the completion of the merger [with Holcim] we will surely be watched closely when we seek to resume them, and nothing says that the area will have been freed from the grip of ISIS, nor that it will be free from it for years."

143.     On September 12, 2014, Executive 1 sent an email to Executive 2 saying, "I think it's imperative to maintain the plant in working order and to be able to restart quickly." Executive 1 went on to say, "[i]t seems to me that this option is totally doable, if the strikes of the coalition quickly weaken the jihadist forces. The plant will no longer be an objective for them." He wrote this, despite acknowledging that, "the legal unit" was concerned about Lafarge's relationship with ISIS.

144.    Ultimately, however, LCS evacuated the cement plant ahead of advancing ISIS militants on or about September 18, 2014.

145.    ISIS seized control of the plant on September 19, 2014.

146.    ISIS stole cement that LCS had produced in furtherance of the conspiracy, and ISIS sold cement at prices that would have yielded ISIS approximately $3.21 million.

## III.    Defendants Knew That They Were Supporting A Foreign Terrorist Organization.

147.    At all times, Defendants understood that they were dealing with U.S.-designated terrorists. As described above, in September 2013, Lafarge's Security Committee conceded that Lafarge and LCS were "having to directly or indirectly negotiate with networks classified as terrorists by international organizations and the US." And in August 2014, Lafarge executives internally discussed the United States' designation of ISIS's Al-Adnani as a terrorist.

148.    Defendants took numerous steps to conceal their partnership with ISIS by falsifying or obscuring documents and by using intermediaries.

149.    First, Lafarge and LCS executives ensured that any documents regarding these terrorist payments did not reference the word "Lafarge."

150.    On September 16, 2013, Executive 3 instructed Intermediary 1 that "the name of Lafarge should never appear for obvious reasons in any documents of this nature," referring to checkpoint passes from ISIS. He continued, "[p]lease use the words Cement Plant if you need but never the one of Lafarge."

151.    Similarly, on September 4, 2014, Executive 4, LCS's incoming CEO, complained to Intermediary 1 about documents that specifically referred to "Lafarge" by name: "The name Lafarge and the fact that Lafarge 'paid' appears on the laissez-passer passes issued by ISIS. This is completely against our agreement with ISIS. It is clear that these passes were issued for the distributors, not for Lafarge. Could you look into solving this issue?" Intermediary 1 agreed that

"we have to change the name or have an alias that all the laissez-passer passes use as well as the distributors because ISIS cannot let all the cements get through, just ours."

152.    Second, Defendants used intermediaries—rather than Lafarge or LCS executives—to engage directly with the terrorists.

153.    As one of LCS's security consultants stated, "it was especially important that the relationship would be handled by [Intermediary 1's] middlemen, since an exposure of this sort would have been compromising for LCS." The LCS consultant concedes: "But via [Intermediary 1], we did in fact contribute to the economy of ISIS."

154.    Not only did Defendants prefer to work through intermediaries, but they took steps to conceal the payments they made to those intermediaries. In fact, Lafarge and LCS executives directed Intermediary 1 and Intermediary 2 to submit invoices that did not reference their own names or the names of their companies and that instead referenced payments for donations, unspecified professional fees, or personal expenses.

155.    For example, on December 13, 2012, Executive 3 emailed Intermediary 1 and directed that any future invoice should not be on Intermediary 1's company's letterhead, but instead should be on that of a company outside of Syria:

> I would like to remind you that we still need to receive correct invoices from [Intermediary 1's company] for the months of September and October. We discussed this issue many times and you told me it is not a problem so please send them as soon as possible. For the November payment, we cannot take the documents you prepared with [the Intermediary 1 Company] in the title.
>
> As I told you, you need to send us the references of a [new] company located outside of Syria.
>
> This will avoid problems with the Syrian authorities and with our Auditors.
>
> We absolutely need to move forward before the end of the year to be able to present clean justifications for the [] closing of our accounts.

156.    In connection with their efforts to conceal payments and falsify records, LCS executives made clear that they preferred to transact through U.S. dollar bank transfers.  On June 30, 2013, Executive 3 emailed Intermediary 1, "[W]e cannot continue the way we are settling the turnover invoices.  Our preferred option would be the one we told you last October: a bank transfer in USD to the account of a duly registered company," as opposed to a direct payment to Intermediary 1 in cash, which would appear more suspicious.  Thus, Defendants instructed their terrorist intermediary to create a new corporate entity so that Defendants could surreptitiously transact in U.S. dollars, transactions that Defendants knew would transfer, clear, and be processed through New York.

157.    Similarly, a February 2, 2014 "External Support Agreement" between LCS and a new company created by Intermediary 1 confirmed that payments should be made in U.S. dollars.  LCS agreed to pay the new company "a monthly remuneration of 75.000 USD."

158.    Lafarge and LCS executives made similar efforts to disguise the nature of payments to Intermediary 2, including by directing that payments reference only environmental consulting and be made using U.S. dollars.  For example, on January 12, 2014, Executive 3 emailed Intermediary 2:

> Prepare an invoice from [Intermediary 2's company], send to me by email and bring the original next week, for an amount of 4,402 USD just with "Environmental consultancy services for the months of October, November and December 2013" as a justification.
>
> For your understanding hereunder are the details of the calculation:
>
> - pozzolana: 18,270 tons equivalent to 914 USD (he has delivered the first order of 15,000 tons and 3,270 tons out of the order of 100,000 tons)
>
> - HFo: 3,488 tons equivalent to 3,488 USD (he has not yet completed the first order of 4,000 tons, it remains 512 tons to deliver and he has not started the 12.000 tons of standard quality)

Total:4,402 USD

159.     A few weeks later, on February 5, 2014, Executive 3 again required that payments

reference only environmental consulting and be made in U.S. dollars:

> If you want to have a chance to get paid for pozzolana and HFO, you
> have to prepare an invoice following my instructions and not your
> imagination.
>
> So you have to issue an invoice mentioning only:
>
> Consultancy services performed up to January 31, 2014, for a total amount
> of 4,836 USD
>
> This amount has been calculated as follows (up to 31-1-2014) HFO: 3,488
> tons out of the order of 4,000tons= 3,488 USD
>
> Pozzolana: 15,000t out of the order of 15,000t (completed) plus 11,964t
> from the order of 100,000t i.e total 26,964/20= 1348 USD
>
> Send me the invoice asap so that you have a chance to be paid next week.

160.     On February 13, 2014, Intermediary 2 sent Executive 3 the invoice "[b]ase[d] on

your instruction." The invoice, payable to the intermediary's company, purported to be for

"[c]onsultancy services."

161.     Third, as another way to conceal their conspiracy and partnership with ISIS,

Lafarge and LCS executives used personal email accounts serviced by U.S.-based email service

providers, instead of their Lafarge corporate email addresses, to coordinate and carry out elements

of their partnership with ISIS.

162.     For instance, on September 8, 2014, in connection with a discussion about

documents received from ISIS, Executive 4 wrote to Executive 1, "Thank you for sharing this

information with [Executive 2], I don't want to write to him about this topic at his professional

address (as recommended by [in-house counsel])." Thus, LCS's own legal counsel had instructed

LCS's CEO not to create a Lafarge business record concerning the company's illegal terrorist financing.

163.    Following the evacuation of the cement plant, Defendants further attempted to conceal their business relationship with Intermediary 1 and ISIS. They did so by drafting a backdated contract-termination agreement that would allow them to falsely claim that Intermediary 1's relationship with LCS had been terminated before he conducted negotiations with ISIS in August and September 2014.

164.    On September 29, 2014, Intermediary 1 informed Executive 2 and Executive 4 that, in response to their prior requests, Intermediary 1 had opened a bank account in Dubai in the name of a new company that was not publicly linked to Intermediary 1 ("Intermediary 1 NewCo").

165.    On October 9, 2014, Executive 4 sent an internal email to Executive 3 and Lafarge's in-house counsel with the subject "New contract for [Intermediary 1]" and saying that LCS owed Intermediary 1 "Monthly fees 2*75kUSD for services in July and August" plus "August sales tax to PYD, already paid by [Intermediary 1] to PYD : 10.5 M SYP = 60kUSD)" totaling "210kUSD."

166.    The same day, Executive 4 further wrote that the in-house lawyer "would like to terminate the previous contract [with Intermediary 1] on the date of 18th August to show evidence of company reaction to UN resolution, and to get a new contract to start from September 1st, 2014." In a subsequent email on October 14, Executive 2 clarified Lafarge would not pay Intermediary 1 without a new backdated contract.

167.    On October 14, 2014, Executive 4 sent an email to Intermediary 1 with the subject line "Agreement for Regional Security Consulting Services," attaching copies of the new consulting agreement between a holding company created by LCS ("LCS NewCo") and

Intermediary 1 NewCo, and (2) the backdated Termination Agreement between LCS and Intermediary 1 NewCo.

168.    In his cover email, Executive 4 explained that the new consulting agreement was "written in such a way as to" take "into account the compensation for termination of the previous contract (210k USD for 202k USD which are actually due)." A $210,000 lump sum payment compensated ISIS Intermediary 1 for work he had already performed negotiating an agreement with ISIS, and to reimburse him for making fixed monthly "donation" payments to armed groups, including ISIS.

169.    In addition to the lump sum payment, the new consulting agreement required the Defendants to make monthly payments of $30,000 to Intermediary 1 on a going-forward basis.

170.    The Termination Agreement was backdated to August 18, 2014, the day LCS employees abandoned the Cement Plant. The metadata of the backdated Termination Agreement indicates that the document was not drafted by Lafarge's in-house lawyer until October 3, 2014, despite bearing the date August 18, 2014, on the face of the agreement.

171.    On October 23, 2014, after the parties signed the new consulting agreement and the backdated Termination Agreement, Intermediary 1 sent an invoice for $210,000.

172.    Lafarge paid the $210,000 invoice with a wire transfer from Lafarge's operating account at a financial institution in Paris, through the Eastern District of New York, to intermediary banks in New York City, which transmitted the wire to Intermediary 1 NewCo's account at a financial institution in Dubai.

173.    Lafarge's selection of transactions routed through New York intermediary banks was neither random nor fortuitous, but reflected Lafarge's "preferred option" to transact in U.S.

dollars in an effort to stymie its Europe-based auditors and avoid detection of its knowing terrorist financing.

### IV. Defendants' Material Support To ISIS Substantially Assisted The Terrorist Attack That Harmed Plaintiffs.

174.    Lafarge and LCS pleaded guilty and admitted giving ISIS and ANF $5.92 million, though the actual payments may be much higher.  Defendants also left millions of dollars of cement in ISIS's hands or sold it to them directly. The money Defendants provided to ISIS, at a time when ISIS was looking to expand and commit attacks, materially strengthened ISIS's ability to commit terror attacks, including the Attack that killed and injured Plaintiffs.

175.    Without funding, terrorist attacks cannot be planned, fighters cannot be paid, and propaganda cannot be generated, edited, and distributed. But more than that, Defendants conspired with and sought to partner as closely as possible with ISIS, to pay percentages of its sales to ISIS, purchase materials from ISIS and sell its cement to ISIS, and ultimately to enter an agreement for ISIS to block its competitors in exchange for a slice of the Cement Plant's profit. In return, ISIS carried out exactly the types of attacks that had made it such an enticing business partner in the first place: terrorist attacks to expand and maintain its control of territory and markets.

176.    The cost of ISIS's individual attacks, and salaries for their fighters, paled in comparison to the funding provided to those groups by Defendants. By one estimate, ISIS fighters received a base pay of approximately $200-400 per month. Just $5,000 to ISIS could pay 20 terrorists (at $200 per fighter) and three commanders (at $333 per commander) in the field for a month. $5,000 could also purchase dozens of bomb components or finance multiple complex attacks, including the suicide bombing Attack that harmed Plaintiffs.

177. ISIS publicly confirmed in a video that it deployed its "taxes," that is, money collected from its territory, including from Defendants, to support "[t]he mujahidin and jihad"—that is, its fighters and its fight.[36]

178. The money ISIS received from Defendants was therefore used to pay fighters, control territory and markets, and commit terrorist attacks.

179. ISIS recruited tens of thousands of foreign fighters to commit attacks. The limiting factor on those attacks was money, not manpower. As Mustafa Abu al-Yazid, an al-Qaeda financing chief, said: "There are hundreds wishing to carry out martyrdom- seeking operations, but they can't find the funds to equip themselves. So funding is the mainstay of jihad."[37]

180. Indeed, following the payments by Defendants, ISIS attacks against Americans increased. These attacks began with its beheadings of American journalists and humanitarian workers in 2014. ISIS's targeting of Americans rapidly expanded, following and utilizing Defendants' payments, to killing Americans in Libya, Syria, Iraq, Turkey, and other countries around the world.

181. The USD and other funds Defendants admitted to placing in ISIS's hands from 2012-14, and potentially beyond, had a lasting impact. ISIS had sophisticated financial accounting and saving systems. As late as February 2019, according to a U.S. government report, ISIS continued to hold onto amounts of "stockpiled cash."[38]

---

[36] Saut al-Iraq, *Mosul Businessmen*: *Al-Qa'ida Has Returned To Collect Money* (Oct. 24, 2011).

[37] Dr. Margaret Sankey, Blood Money: *How Criminals, Militias, Rebels, and Warlords Finance Violence* at 296-97 (Naval Institute Press 2022).

[38] Lead Inspector General for Overseas Contingency Operations, Operation Inherent Resolve, Quarterly Report to the United States Congress, April 1, 2019-June 30, 2019, Pursuant to § 8L of the Inspector General Act of 1978 at 22 (Aug. 2, 2019), https://www.stateoig.gov/report-29.

182.    Moreover, the cement that Lafarge handed over to ISIS was durable, by its very nature. The tunnels and infrastructure ISIS built with Lafarge's cement would have lasted past 2014.

183.    Indeed, cement was a highly valuable strategic material necessary to defend territory against counter attacks. ISIS needed to control that territory to export its terrorism to Turkey, the European Union, and beyond, both to produce its propaganda and to bolster its narrative that Allah had led ISIS to conquer territory and defeat the infidels.

184.    Defendants' admitted material support for ISIS in 2014 foreseeably contributed to ISIS's long-term savings and its ability to commit attacks multiple years later; material support in subsequent periods to which Defendants have not admitted contributed to ISIS's ability to commit attacks even later.

185.    ISIS's fundraising apparatus was organized and centralized, meaning that there was a strong link between Defendants' payments and ISIS's terrorist attacks. Terrorism scholars Dr. Colin Clarke and Dr. Phil Williams explain that "[m]uch like its predecessor, AQI, [ISIS] . . . adopted a top-down approach that maintained hierarchical control over and a high degree of accountability for its financial assets as it worked to keep an ironclad grip over the money it earned from a series of rackets."[39] The U.N. Security Council's ISIS panel notes that ISIS's "core leadership" in Syria and Iraq exercised "systematic financial direction" over its provinces'

---

[39]    Dr. Colin P. Clarke & Dr. Phil Williams, Da'esh In Iraq And Syria: Terrorist Criminal Enterprise, in Dr. Kimberley L. Thachuk & Dr. Rollie Lal (Editors), *Terrorist Criminal Enterprises: Financing Terrorism Through Organized Crime* 38 (Praeger 2018) [hereinafter "Clarke & Williams, Da'esh In Iraq And Syria"].

financing. Such systematic financial direction ensured that Defendants' money in Syria supported ISIS's terrorist attacks in other areas in which it operated.[40]

186.    Defendants channeled funds into ISIS's stronghold in Raqqa, which is near the Turkish border.  Indeed, Defendants' support for ISIS has a close nexus to the very Attack at issue here.

187.    As described further below, Mehmet Öztürk, the perpetrator of the Attack, traveled to Syria in 2013, fought with ISIS, including in Raqqa, for approximately two years.[41]

188.    The Cement Plant was near Raqqa, one of the first cities to fall to opposition groups during Syria's civil war. ISIS's Raqqa cell attained prominence within ISIS itself because of its central location and the large population under its control. It became critical to planning ISIS's outward reach, and ISIS leadership flocked there. While ISIS was founded and led by Al-Baghdadi in Iraq, its expansionary military strategy and much of its operations and planning were centered in Raqqa. Al-Baghdadi declared that Raqqa would be the seat of his state, due to its proximity to both Iraq and Syria. According to LCS's former risk manager, Lafarge negotiated with ISIS's representatives in Raqqa.

189.    ISIS's leadership and strategy were set in Raqqa. Secretary of State John Kerry stated in 2015 that Raqqa was "the core where they're [ISIS] planning" attacks.[42] A Pentagon

---

[40]    U.N. Security Council, Seventh Report Of The Secretary-General On The Threat Posed By ISIL (Da'esh) To International Peace And Security And The Range Of United Nations Efforts In Support Of Member States In Countering The Threat ¶¶ 16-18 (Aug. 16, 2018).

[41]    Daily Sabah, Istanbul suicide bomber Öztürk fought in DAESH ranks for 2 years (Mar. 22, 2016), https://www.dailysabah.com/war-on-terror/2016/03/22/istanbul-suicide-bomber-ozturk-fought-in-daesh-ranks-for-2-years; Zaman Alwsl, Leaked ISIS data of Abu Mustafa Ozturk, relative of Istiklal's suicide bomber (Mar. 20, 2016), https://en.zamanalwsl.net/news/article/14737.

[42]    Secretary of State John Kerry, *quoted in* Bassem Mroue and Zeina Karam, *IS Militants Dig In, Anticipating Assault On Syria's Raqqa*, Associated Press (Nov. 18, 2015), https://apnews.com/259382ac991a491cb73708c5d424f2a9.

spokesperson likewise confirmed that ISIS's militant administration and leadership were based in Raqqa. As described by the Commander of U.S. Central Command, Raqqa was "where [ISIS's] plotting takes place … Raqqa is recognized as the financial, leadership and external ops center of the Islamic State."[43] As the de facto capital, Raqqa was the center of ISIS's training and planning. Raqqa was "where ISIS plans their external operations."[44]

190.    ISIS's Raqqa cell was led by Abu Luqman, also known as Ali Musa Al-Shawakh, from early 2014 until his death in an airstrike in 2018. Abu Luqman had been a powerful ANF terrorist but then switched his allegiance to ISIS and recruited several hundred ANF fighters to join ISIS's ranks in Raqqa. He served on ISIS's Leadership Cell, as well as on ISIS's Intelligence Cell. Abu Luqman was head of ISIS's Directorate of General Security, which was responsible for intelligence gathering, detentions, state security, and external intelligence. Public reports state that Abu Luqman served on a "shadow board" of the Cement Plant. Abu Luqman also controlled ISIS's oil sales in northern Syria, which likely included sales of fuel to LCS.

191.    In December 2014, Abu Luqman himself was present, alongside Lafarge's agent Taleb (Intermediary 2), to facilitate ISIS's purchase of remaining materials in Lafarge's factory, worth $11.5 million. The next month, at Defendants' expense, Taleb visited Lafarge's headquarters in Paris to report on the ongoing negotiations with Abu Luqman to re-open the plant under Lafarge's supervision.

192.    Abu Luqman and the Raqqa leadership therefore participated in the expansion of ISIS's territory beyond Iraq and Syria. The Raqqa cell was critical to determining when and how

---

[43]    General Joseph Votel, *quoted in* Peter Bergen, *A Conversation With The General Running The War Against ISIS*, CNN (Oct. 30, 2016), https://www.cnn.com/2016/10/30/world/man-whosrunning-war-vs-isis-bergen/index.html.

[44]    *Id.*

to recruit or accept additional members, where to expand, and how to commit attacks outside Raqqa by (1) vetting, recruiting, training, arming new jihadi fighters, and establishing new ISIS "provinces" beyond Iraq and Syria; (2) serving as the bridge between ISIS's leadership and local cells on the ground in other locations and (3) supplying logistical, training, and financial support for ISIS's external attacks.

193.    On information and belief, Öztürk was a member of ISIS's Raqqa cell.

194.    Accordingly, Defendants' substantial support for ISIS played a direct role in the Attack that harmed Plaintiffs.

## V.    Defendants' Unlawful Conduct Had A Substantial Nexus To New York And The United States.[45]

195.    Defendants' conduct had a substantial nexus to New York and to the United States in three different, but related ways: (1) Defendants transferred money through correspondent banks located in New York; (2) Defendants purposefully used email servers located in the United State to avoid detection of their conspiracy; (3) Defendants engaged in a conspiracy with ISIS, whom Defendants knew were plotting and engaged in attacks against Americans and the United States.

### A.    Defendants Purposefully Relied On New York Banks To Clear The U.S.- Dollar Transactions They Used To Finance Terrorism

196.    Defendants intentionally used the U.S. financial system and caused wire transfers to clear through New York banks, thereby purposefully availing themselves of New York's banking system. Specifically, Lafarge directed its banks to complete U.S.-dollar-denominated wire

---

[45]    The allegations in Section V.A and V.B are made on information and belief based on the allegations contained in the operative complaints in two other, similar matters filed against Lafarge. *See* First Amended Complaint at ¶¶ 212-¶¶ 254, *Finan v. Lafarge*, No. 1:22-cv-07831-NGG-PK (E.D.N.Y.), ECF No. 23; Complaint at ¶¶ 147-226, *Foley v. Lafarge*, No. 1:23-cv-05691-NGG-MMH (E.D.N.Y.), ECF No. 1.

transfers to support its scheme to fund ISIS, and Lafarge's officials knew those directions required the use of New York banks.

### 1. Defendants executed U.S.-dollar transactions that relied on New York correspondent and intermediary banks.

197.    Correspondent, or intermediary, banks are the conduit for a financial transaction when a sender's bank cannot perform a direct transfer in the desired currency with the recipient bank. Almost all correspondent banks that perform U.S. dollar transactions are located in New York, which allows them to use the U.S Clearing House Interbank Payments System ("CHIPS"). CHIPS estimates that in 2015 it was responsible for processing more than 95 percent of cross-border transactions denominated in U.S. dollars.[46]

198.    Defendants preferred transacting almost entirely in dollars, both because U.S. dollars were protected from the rapid depreciation of the Syrian pound and because the international transactions through the U.S. banking system masked the true purpose and intent of their transfers. Indeed, Defendants "preferred option" for paying terrorists was to make "bank transfer[s] in USD," which were designed to avoid detection by Defendants' auditors and governmental entities.

199.    As an initial matter, Lafarge and LCS admitted in the Information connected with their guilty plea that a lump sum wire transfer of $210,000 from Lafarge's operating account at a financial institution in Paris passed through the Eastern District of New York to intermediary banks in New York City. The contract pursuant to which that payment was made required Defendants to make ongoing monthly payments of $30,000.

---

[46]    U.S. Dep't of Treasury, *National Money Laundering Risk Assessment* at 35 (2015), https://home.treasury.gov/system/files/246/National-Money-Laundering-Risk-Assessment-06-12-2015.pdf.

200.     Defendants' executives also sent emails confirming that numerous other payments in furtherance of their conspiracy with ISIS were made in U.S. dollars. Plaintiffs, on information and belief, believe that there have been at least 23 relevant transactions related to Defendants' terrorist-funding scheme that were denominated in U.S. dollars and used the New York financial system, although this is only a list of transactions available without discovery.

201.     On information and belief, Defendants made at least nine U.S.-dollar-denominated upstream payments and at least 14 U.S.-dollar-denominated downstream payments through the New York banking system. Upstream payments were the ones that Lafarge made, typically through Lafarge Cyprus, to send LCS money for operating expenses—including terrorist payments. Lafarge made downstream payments to Tlass (Intermediary 1) and Taleb (Intermediary 2) so that they could pay ISIS on Lafarge's behalf. The chart below, on information and belief, depicts each payment:

| Date | Category | Sender | Recipient | USD Amount |
|---|---|---|---|---|
| 4/28/2011 | Upstream | Lafarge Cyprus | LCS | $20,000,000 |
| 7/31/2011 | Upstream | Lafarge Cyprus | LCS | $5,000,000 |
| 8/25/2011 | Upstream | Lafarge Cyprus | LCS | $10,000,000 |
| 8/25/2011 | Upstream | Lafarge Cyprus | LCS | $5,000,000 |
| 3/18/2012 | Upstream | Lafarge Cyprus | LCS | $10,000,000 |
| 9/27/2012 | Upstream | Lafarge Cyprus | LCS | $16,500,000 |
| 12/27/2012 | Upstream | Lafarge Cyprus | LCS | $15,500,000 |
| July 2013 | Downstream | LCS | Tlass | $75,000 |
| August 2013 | Downstream | LCS | Tlass | $75,000 |
| September 2013 | Downstream | LCS | Tlass | $75,000 |
| 9/30/2013 | Upstream | Lafarge Cyprus | LCS | $5,000,000 |
| October 2013 | Downstream | LCS | Tlass | $75,000 |
| November 2013 | Downstream | LCS | Tlass | $75,000 |
| December 2013 | Downstream | LCS | Tlass | $75,000 |

| January 2014 | Downstream | LCS | Tlass | $75,000 |
| February 2014 | Downstream | LCS | Tlass | $75,000 |
| February 2014 | Downstream | LCS | Taleb | $4,836 |
| March 2014 | Downstream | LCS | Tlass | $75,000 |
| April 2014 | Downstream | LCS | Tlass | $75,000 |
| May 2014 | Downstream | LCS | Tlass | $75,000 |
| June 2014 | Downstream | LCS | Tlass | $75,000 |
| 6/10/2014 | Upstream | Lafarge Cyprus | LCS | $11,000,000 |
| 10/23/2014 | Downstream | Lafarge Cyprus | Tlass | $210,000 |

202.    On information and belief, the nine upstream payments, totaling $98 million, were disbursements made under an April 7, 2011 loan agreement between Lafarge Cyprus and LCS to give LCS operational funding, including for the purpose of maintaining its conspiracy with ISIS.

203.    Lafarge's General Counsel and Corporate Secretary signed the loan agreement on Lafarge Cyprus's behalf and oversaw the first seven disbursements, and Lafarge's Assistant General Counsel oversaw the final two disbursements. Lafarge Cyprus funded LCS at Lafarge's direction and subject to its control. Indeed, Lafarge admitted it was responsible for the October 23, 2014 payment to Tlass although Lafarge structured that payment as nominally originating from Lafarge Cyprus. The other Lafarge Cyprus payments above similarly occurred at Lafarge's direction. Lafarge Cyprus sent the upstream payments in part by wiring U.S. dollars into accounts LCS maintained with Bank Audi in Lebanon and Syria. LCS in turn paid out the U.S. dollars to pay Taleb and Tlass to dole out to the terrorist groups with whom Lafarge conspired. Lafarge Cyprus's payment method was the best way for LCS to navigate sanctions on financial transfers to Syria.

204.    When Lafarge decided to make a $12 million disbursement on June 10, 2014, through Lafarge Cyprus, it had long known LCS was making payments ISIS through

intermediaries—it was doing so with Lafarge executives' oversight and approval and for the purpose of continuing to make payments to terrorists. It also knew LCS was paying Tlass $75,000 in U.S. dollars monthly to compensate him for negotiating with ISIS. Lafarge still decided to pay LCS an additional $12 million in what, on information and belief, an email from its treasury manager called "fresh cash"—cash for terrorists.

205.    All but one of the 14 downstream payments was a monthly $75,000 payment LCS made to Tlass to enable his payments to ISIS and ANF. Lafarge's agreement with Tlass set that Tlass would "retain $50,000 and the remaining $25,000 would be disbursed to armed groups." The amounts were purposefully in U.S. dollars, for the purposes of stability and concealment described above. The payment of $210,000 included $150,000 to cover Tlass's monthly stipend from July and August 2014. On information and belief, U.S. dollar payments, which were required under the contract Defendants negotiated with Tlass, and which were also paid to intermediary Taleb, continued after October 2014 as Defendants continued to try to regain control of the cement plant into and after early 2015.

206.    Lafarge's U.S. dollar transactions almost certainly cleared through CHIPS, and thus through New York banks. Participating in the clearing system requires U.S. presence, in part to ensure that U.S. law will govern cross-border U.S.-dollar transactions. Most such banks' U.S. presence is in New York, since U.S. dollar clearing almost always requires access to the Federal Reserve Bank of New York.

207.    On information and belief, Defendants' U.S.-dollar transactions followed the norm and were sent via the New York banking system. This allegation is based on the specific banks Defendants used to effectuate these transactions, and on at least three examples of

transactions that Lafarge and Lafarge Cyprus specifically cleared through New York (beyond the one transaction to which it has admitted).

208.    Defendants may have used other banks, but they relied predominantly on three bank branches in funding their payments to terrorists: Bank Audi (Lebanon), Bank Audi (Syria), and BNP Paribas (Egypt). The use of these three banks supports the allegation that Defendants purposefully cleared their U.S.-dollar transactions through New York, because each bank cleared U.S.- dollar transactions through correspondent bank relationships with New York banks.

209.    LCS held accounts with Bank Audi SAL ("Bank Audi Lebanon") that it used to make many of its payments to Tlass and Taleb and to receive upstream funding from Lafarge and Lafarge Cyprus. Bank Audi Lebanon was based in Beirut and operated as the Lebanese branch of Bank Audi, a multinational bank. Bank Audi Lebanon maintained U.S.-dollar correspondent accounts at least at the following New York banks, all of which Bank Audi has publicly acknowledged:

| No. | Correspondent U.S. Bank Relationship in New York | Correspondent U.S. Bank SWIFT Code[47] |
|-----|--------------------------------------------------|----------------------------------------|
| 1 | Standard Chartered Bank – NY | SCBLUS33XXX |
| 2 | JPMorgan Chase Bank, N.A. | CHASUS33XXX |
| 3 | The Bank of New York Mellon | IRVTUS3N |
| 4 | HSBC – NY | MRMDUS33XXX |
| 5 | Citibank, N.A. | CITIUS33XXX |

210.    Bank Audi Lebanon does not have independent dollar clearing capabilities. It processed Defendants' U.S.-dollar transactions through the New York banking system by routing

---

[47] Some of these accounts were used for Eurodollar-related transactions that flowed through the U.S. banking system. On information and belief, Defendants likely used the same correspondent accounts to facilitate their U.S.-dollar-denominated transactions or used other correspondent accounts at the same banks to facilitate such transactions.

their funds through Bank Audi's correspondent accounts with these New York banks, including but not limited to JPMorgan Chase's New York branch.

211.    Bank Audi Lebanon's standard settlement instructions support the conclusion that Defendants' transactions relied on New York correspondent accounts. Standard settlement instructions detail the accounts a financial institution will use to complete transactions depending on the currency the institution's customer selects. Before the relevant time frame, Bank Audi published its standard settlement instructions in the Banker's Almanac, an authoritative and publicly available compendium of international banking information. Those instructions, available to Defendants, specified that Bank Audi Lebanon typically settled U.S.-dollar wire transfers through its correspondent accounts at "The Bank of New York, New York" and "JPMorgan Chase Bank, National Association, New York."

212.    On information and belief, from 2011 through 2015, LCS used Bank Audi Syria S.A. ("Bank Audi Syria") as Bank Audi's branch in Damascus. On information and belief, at all relevant times, Bank Audi Syria faced significant obstacles conducting cross-border U.S.-dollar-denominated transactions, which were impacted by U.S. sanctions. LCS relied on its U.S.-dollar accounts at Bank Audi Lebanon instead for U.S.-dollar transactions.

213.    On information and belief, in or about 2013, Lafarge and Lafarge Cyprus also instructed LCS to open an Egyptian bank account in the name of Lafarge's Egyptian subsidiary, Lafarge Middle East & Africa Building Materials, which Lafarge internally called "LMEA." On information and belief, LCS opened this LMEA Account at BNP Paribas's branch in Cairo. LCS regularly used its "LMEA Account" to make and receive U.S.-dollar payments, including by making a July 2013 payment of $75,000 from LCS to Tlass. Lafarge funded the account, via Lafarge Cyprus in U.S. dollars as needed, for LCS's benefit. On information and belief,

Defendants used this account to make many suit-related U.S.-dollar payments, including several not listed among the twenty-three transactions in the table above.

214.    Like Bank Audi, BNP Paribas's subsidiaries clear their U.S. dollar transactions through New York. According to its 2012 Patriot Act certification, BNP Paribas's subsidiaries, including its Egyptian branch, relied on "correspondent banks in the United States." BNP Paribas's global Corporate and Investment Banking Group, of which it considered the LMEA Account a part, regularly relied on U.S. banks to clear the Group's U.S.- dollar transactions. Due to a highly publicized U.S. enforcement action in mid-2014, BNP Paribas was forced to suspend U.S.-clearing operations for a year. As a prominent French newspaper noted in reporting on that action, BNP Paribas recognized that its U.S.-dollar transactions for sanctioned entities exposed it to U.S. criminal penalties, because when "any dollar transfer passes through the United States to be cleared by the American financial system, [that] dollar transaction is automatically goverend by U.S. law." On information and belief, BNP Paribas's Egyptian branch cleared U.S. dollars the same way until that suspension.

215.    BNP Paribas's standard settlement instructions confirm that Defendants transactions using the LMEA Account cleared in New York. Like Bank Audi, BNP Paribas published its standard settlement instructions in the *Banker's Almanac*. Before the relevant timeframe, BNP Paribas Egypt advertised its "Correspondent Banking" service and identified "BNP Paribas SA" as its "correspondent" bank in "New York." The standard settlement instructions likewise specified that BNP Paribas Egypt typically settled U.S. dollar wire transfers for its customers through its correspondent account with "BNP Paribas SA, New York."

216.    Plaintiffs are aware, on information and belief, of at least three transactions related to Defendants' terrorist-financing scheme that Defendants specifically cleared through New York

banks. These examples were found without the benefit of discovery. The details of such transactions rest within Defendants' exclusive control, so many more examples likely exist.

| Date | Amount (USD) | Originating Bank/ Originator | Beneficiary Bank/ Beneficiary | New York Correspondents |
|---|---|---|---|---|
| 8/25/2011 | $5,000,000 | Citibank Dubai / Lafarge Cyprus | Bank Audi / LCS | Citibank New York JP Morgan Chase |
| 8/25/2011 | $10,000,000 | Citibank Dubai / Lafarge Cyprus | Bank Audi / LCS | Citibank New York JP Morgan Chase |
| 10/23/2014 | $210,000 | TBD (France) / Lafarge-Cyprus | TBD-Dubai/ Tlass | TBD-New York |

217.    On information and belief, when Lafarge chose to make these payments through Lafarge Cyprus, it purposefully reached into New York to complete the transactions. For example, with the October 23, 2014 payment for Tlass's negotiations with ISIS, Lafarge directed Tlass to issue a $210,000 invoice from a Dubai shell company. On information and belief, Lafarge paid the invoice by directing its Parisian bank to initiate a wire transfer on behalf of Lafarge Cyprus, which sent funds through New York correspondent banks—including at least one in this District—to Tlass's bank account in Dubai. On information and belief, and part and parcel with their efforts to conceal their conduct, Defendants knew and intended for this transaction to use the U.S. financial system and to clear through New York.

218.    Given that these transactions formed part of a common course of conduct involving U.S. dollars, Defendants likely used the same (or similar) New York banks to route other U.S.-dollar transfers through New York. In general, customers and their banks follow similar routing processes to complete similar transactions in the same timeframes for the same currencies. Given that standard practice, and the other allegations above, these three examples are likely illustrative of Defendants' broader practice of using New York banks to complete the U.S.-dollar transactions in which they systematically engaged as part of the conspiracy. Indeed, it is

implausible that Defendants used New York banks for just these three transfers and not any of the myriad similar transactions alleged herein.

### 1.    Defendants' use of New York banks was material to their scheme.

219.    Using dollars made the conspiracy with ISIS easier and more efficient for participants, and more difficult for law enforcement and other outsiders to detect.  While ISIS was not always paid in U.S. dollars, ISIS and Defendants preferred to do business with each other in U.S. dollars.  Defendants' regular and deliberate use of U.S. dollar transactions, which in turn depended on their access to the New York banking system, was vital to the scheme's concealment and success.  Their conscious choice to use U.S. dollars and New York banks offered at least three benefits.

220.    First, using U.S. dollars and U.S. banks helped Lafarge conceal their payments from outside auditors, regulators, and law enforcement officials.  Concealment was of paramount importance, given the stringent U.S. and international sanctions targeting Syria at the time, and the illegality of the payments to terrorists.  Lafarge's Syrian operations faced significant financial scrutiny.  The use of U.S. dollars helped Defendants avoid the scrutiny of LCS's external auditors.  Transactions in Syrian pounds raised red flags among regulators, auditors, and bank-compliance departments, while U.S. dollars were associated with legitimate cross-border transactions, particularly when routed to companies outside Syria.  Lafarge's executives thus "preferred" its payments for ISIS and ANF be made in "bank transfer[s] in USD," to give its wire transfers the imprimatur of legitimacy associated with U.S.-dollar transactions.

221.    On information and belief, Lafarge funneled payments through a web of 54 different bank accounts (mostly at Bank Audi), including several routed through a personal account to keep certain transactions off Lafarge's books.  Using such a large number of accounts made it even more difficult for others to detect the scheme.  The excessive number of bank accounts, which

Defendants actively created, demonstrates a broader point: secrecy was vital, and Defendants were affirmatively involved in the financial machinations that enabled their scheme.

222.    Second, transacting in U.S. dollars protected Defendants and their agents from foreign-exchange risk and the plummeting value of the Syrian pound.  At the beginning of 2012, the Syrian pound was trading against the U.S. dollar at roughly 54:1.  By the end of 2014, it had depreciated to roughly 180:1—losing more than two-thirds of its value.  This made Syrian pounds unappealing for any long-term deal.  Indeed, Tlass demanded that Lafarge pay his monthly fee in U.S. dollars in part because the Syrian pound was losing value so rapidly as to become effectively worthless.

223.    Third, ISIS's preferred currency was U.S. dollars.  Real-time public reports linked ISIS's fundraising and recruiting success to its stockpile of U.S. dollars, which is how ISIS fighters wanted to be paid.  As *Business Insider* reported in 2015:

> According to [an ISIS defector], a large number of people are joining ISIS because they need money. After joining [ISIS], people are paid in US dollars instead of Syrian [pounds]. . . . ISIS members receive additional incentives to fight for the group. "I rented a house, which was paid for by ISIS," Abu Khaled, who worked for ISIS's internal-security forces and "provided training for foreign operatives," [said]. "It cost $50 per month. [ISIS] paid for the house, the electricity. Plus, I was married, so I got an additional $50 per month for my wife. If you have kids, you get $35 for each. If you have parents, they pay $50 for each parent. This is a welfare state." And those financial benefits are not just limited to the organization's fighters.

224.    ISIS preferred U.S. dollars for goods it sold and to pay its fighters.  According to the *Independent*, ISIS "promoted the idea that it was hitting the US economy by issuing its own currency but the organisation on the ground is doing exactly the opposite, having built a financial system entirely dependent on the US dollar."

225.    Using New York banks in furtherance of the conspiracy enabled Defendants to capture these benefits, and, through intermediaries, pass them along to ISIS. New York is the global hub of cross-border U.S.-dollar transfers for good reason: companies that wire their U.S. dollars through New York gain from the legitimacy, reliability, and speed offered by New York clearing. Transacting through other clearing centers in Tokyo, Hong Kong, Singapore, and Manila is theoretically possible, but these require extra cost and time, and raise questions about why the transaction is exceptional, operational risks that New York clearing avoids.

226.    By routing their payments through New York, Defendants maximized the potency and concealment of their terrorist funding. Had Defendants attempted to route their U.S.-dollar payments differently, it would have stood out as unusual, risking the very type of outside attention from auditors and regulators Defendants were striving to avoid. Defendants knew that attempting to route U.S. dollar transactions through non-New York centers was inadvisable. In or around 2012, U.S. sanctions began impeding the ability to route U.S. dollars in and out of Syria. On information and belief, New York banks began refusing to process transactions they knew were for LCS or other Syrian actors. In 2013, when Taleb complained about LCS's lack of prompt payment, LCS employees said that New York correspondent banks were refusing to process their transactions, and tried to find other banks to complete the payment, creating further delays and expense.

227.    In response, Defendants structured transactions that would use the New York banking system to appear as though they were going somewhere other than Syria, for example through the LMEA Account in Egypt. Defendants told Tlass to create a Dubai company for Lafarge Cyprus's payment, to avoid Syrian contacts. These bank account locations enabled

Defendants to route their U.S.-dollar payments through New York banks but still get money into Syria, which was faster and more reliable than the alternatives.

228.    For all the reasons above, had Defendants not chosen to reach into New York and use New York banks to transact in U.S. dollars, their scheme of sending payments to ISIS and ANF would have increased the risk of disruption of payments, been less effective, more expensive, and harder to conceal.

### 2.    Defendants' purposely used New York banks.

229.    Defendants' use of New York banks was deliberate.  U.S. dollars were critical to Defendants' scheme with ISIS and intermediaries.  Needing a safe, effective, and opaque means to transfer their cash, Defendants purposefully chose New York.

230.    Defendants' banks publicly advertised that they routed U.S. dollar transactions through New York.  Bank Audi's public marketing also alerted Defendants to the New York connection.  Specifically, Bank Audi's "Worldwide Correspondents" website disclosed that its U.S.-dollar transactions relied on banks in the "U.S.A." and "N.Y." (emphasis added):



231.    The Syrian government itself alerted Defendants that their U.S.-dollar transactions went through New York. In February 2006, the Syrian government issued Circular Number 810/15 requiring that all foreign-currency transactions for the government that had previously been denominated in U.S. dollars instead occur in Euros, specifically to "avoid settlement problems in the United States" caused by U.S.-dollar clearing through New York banks. That decision, of which Defendants knew, reflected the widespread understanding in Syria that any U.S. dollar transaction goes through U.S. banks.[48]

232.    Even non-privileged client alerts published by Lafarge's counsel alerted Defendants that their transactions used the U.S. banking system. While Shearman & Sterling LLP

---

[48]    Al Jazeera, Syria Picks Euros Over Dollars (Feb. 14, 2006), https://www.aljazeera.com/news/2006/2/14/syria-picks-euros-over-dollars.

was advising Lafarge, it published an alert warning all its clients, including Lafarge, that the United States Department of Justice and Securities and Exchange Commission's guidance indicated an "expansive assertion of territorial jurisdiction over non-U.S. defendants" including "overseas financial transactions involving US dollars," because "virtually all such transactions clear through correspondent banking accounts in the U.S."[49] While Baker & McKenzie represented Lafarge, it alerted its clients about the same guidance, that "a wire transfer from or to a U.S. bank or otherwise using the U.S. banking system" may create U.S. jurisdiction based on the "use of correspondent bank accounts."[50]

233.    Finally, decades of media reports about CHIPS and correspondent banking also alerted Defendants that their U.S.-dollar transactions used New York banks, as far back as articles in the American Banker in 1989,[51] the Los Angeles Times in 1991,[52] the Australian Financial Review in 2002,[53] the Mail on Sunday in 2004 (quoting a source as saying "[c]urrently, if you want to pay United States dollars from bank A to bank B, that transaction has got to go via New

---

[49]    Shearman & Sterling LLP (Philip Urofsky, Stephen Fishbein, Danforth Newcomb, Patrick D. Robbins, Paula Howell Anderson, Richard Kreindler, Markus S. Rieder, Richard Kelly, Jo Rickard, Brian G. Burke, and Brian C. Wheller), *Shearman & Sterling Client Publication: The New FCPA Guide: The DOJ and the SEC Do Not Break New Ground But Offer Useful Guidance and Some Ominous Warnings* at 3 (Nov. 15, 2012), https://bit.ly/3RESGLU.

[50]    Baker & McKenzie LLP (Paul J. McNulty, Joan E. Meyer, Robert W. Kent, Jr., John P. Cunningham, Crystal R. Jezierski, Peter B. Andres, and Erica C. Spencer), *Baker & McKenzie Client Alert: Inside the U.S. Government's Highly-Anticipated FCPA Resource Guide* at 2 (Nov. 16, 2012), https://bit.ly/46ywLu1.

[51]    American Banker, Glossary Of Computer Technology Terms (Feb. 1, 1989), 1989 WLNR 1319450.

[52]    Glas Frantz, *Lax Rules Blamed in Bank Schemes*, Los Angeles Times (Apr. 28, 1991), 1991 WLNR 3887729.

[53]    John Breusch, *US Patriot Law Could Involve Local Banks*, Australian Financial Review (Feb. 12, 2002), 2002 WLNR 15725873.

York."),[54] Newsweek International in 2006,[55] the Economist in 2013,[56] and GulfNews in 2014.[57] Thus, Lafarge officials, who ran one of the largest and most sophisticated multinational corporations in France, were aware of the substance of these reports, even if they had not read any of the reports themselves.

234.    Defendants' executives were aware of how Defendants' money was transferred quickly and effectively to and from LCS.  A Lafarge email discussing its June 2014 loan to LCS demonstrates the degree of that involvement.  In that email, Lafarge's treasury managers discussed the need for Lafarge (through Lafarge Cyprus) to "increase its outstanding subordinated shareholder loan" to LCS by "US$12m to give LCS a small buffer" to cover its ongoing U.S.-dollar shortfalls.  In that discussion, Lafarge employees demonstrated an awareness of how to route the money.  As the same email explained, the wire-transfer "process must start in the few coming days due to time needed to channel the funds to Syria through Lebanon, to lower the risk of cash being trapped by banks' compliance policies linked to sanctions affecting Syria."  The reference to "Lebanon," on information and belief, referred to LCS's account at Audi Bank Lebanon.  Lafarge was thus aware of Bank Audi's correspondent-banking policies, and it sought to guard against the risk that using New York correspondent accounts would expose it to U.S. sanctions.

235.    The steps Defendants took to conceal their transactions confirm that their use of New York banks was deliberate, including by using an "LMEA Account" in Egypt, and ordering

---

54    John Mushayavanhu (Vice Chairman of Bankers Association of Zimbabwe), *quoted in* AllAfrica.com English, *Local Forex Clearance System Expected Soon* (Apr. 10, 2009).

55    Christian Caryl et al., *Pocketbook Policing: Washington Has Finally Found A Strategy That Is Putting Real Pressure On The Regime – Going After Its Sources Of Cash, All Across The World*, Newsweek Int'l (Apr. 10, 2006), 2006 WLNR 5632771.

56    Economist, *Digital Currencies: A New Specie* (Apr. 13, 2013), 2013 WLNR 8890628.

57    Babu Das Augustine, *UAE To Sign FATCA Agreement Soon,* Gulf News (Mar. 13, 2014), 2014 WLNR 6929583.

Tlass to open an account in Dubai. Both these accounts were intended to trick U.S. banks into completing transfers to circumvent U.S. sanctions against transactions in Syria, and to conceal the payments from French auditors and law enforcement officials. They made sense only if Defendants were actively seeking to use the New York clearing system. Indeed, if Defendants had the means to bypass New York clearing, for example, by operating solely in cash or by using off-shore clearing, these accounts outside of Syria would have been entirely unnecessary.

236.    Defendants' executives regularly and purposefully received specific transaction confirmations alerting them to the particular New York correspondent and intermediary banks that routed their transactions. On information and belief, these confirmations typically took the form of SWIFT MT103 messages. SWIFT, which stands for the Society for Worldwide Interbank Financial Telecommunication, is the standard communications system for sending cross-border wire-transfer messages between financial institutions. An MT103 (or Message Type 103) is a standard message confirming the details of an executed transaction. Fields 53, 54, and 56 in an MT103 typically disclose the correspondent and intermediary banks involved. On information and belief, Lafarge (acting through Lafarge Cyprus) and LCS regularly requested and received SWIFT confirmations from their banks notifying them of the New York banks involved in clearing their transfers, as part of Defendants' process of approving the transactions.

237.    When Defendants instructed their banks to process these U.S.-dollar transfers, they intended to (and did) cause their banks to wire money using New York correspondent accounts. And when Defendants' banks carried out those instructions, they did so as Defendants' agents. In a cross-border wire transfer, the originating bank – the bank that first receives the order from the wire originator – carries out the transfer on its originator's behalf. The originator also exercises substantial control over the originating bank. Among other things, Defendants here

specified each transfer's date, amount, and currency denomination. Each time, Defendants' banks had to follow Defendants' instructions. Those instructions here effectively mandated that Defendants' banks rely on New York clearing, on Defendants' behalf.

238.    Defendants also had the right to dictate the use of specific correspondent or intermediary banks. Thus, for each of their U.S.-dollar transactions that cleared in New York, Defendants could have required that their banks use non-U.S. correspondent accounts but consciously declined to so require. And even if Defendants were silent on that topic in their wire instructions, their silence would have required the originating banks to select correspondent banks that would complete the U.S.-dollar payment expeditiously and in accordance with ordinary standards of care in the banking industry. Defendants understood that those considerations in this context effectively dictated New York clearing as well.

239.    Defendants paid and were therefore alerted to banking fees for the New York banks that cleared their transactions. Correspondent and intermediary banks typically charge a fee for each wire transfer that they process, which can be paid in three ways; the specific payment mechanism is typically reported at Field 71A of the SWIFT MT103. Option one—denoted by "OUR"—has the originator cover the fees separately, on top of the amount transferred. For example, on information and belief, the SWIFT message for the $10 million U.S.-dollar upstream payment denoted above (see *supra* ¶¶ 216-17) used the "OUR" option in Field 71A, meaning that Lafarge Cyprus separately paid JP Morgan Chase's fees to compensate it for its New York clearing services. Option two, denoted by "BEN," covers the fees by deducting them from the amount transferred. Option three, denoted by "SHA," is a mix of the two. In each scenario, the sender wires the money to the intermediary or correspondent bank to compensate that bank for the service of processing the transaction. Thus, when Defendants effectuated U.S. dollar transactions to pay

terrorists and intermediaries, they knowingly elected how to pay those New York banks for the service. Defendants—not their originating banks—covered the payment of these fees into New York.

240.    On information and belief, Lafarge specifically approved at least one of the 2011 New-York-cleared transactions alleged above, after personally requesting the SWIFT confirmation disclosing that JPMorgan Chase's and Citibank's New York branches were involved in routing the transaction.

**B.    Defendants Used U.S.-Based Email Providers To Veil Their Terrorist-Financing Scheme.**

241.    To evade detection of their conspiracy with terrorist groups, Defendants also reached into the United States to use U.S.-based email services, reaping the benefit of their email providers' U.S. presence. Those U.S.-driven benefits also materially contributed to Defendants' scheme and enhanced their ability to pay terrorists.

242.    Lafarge's executives were explicitly instructed by their counsel to use personal email addresses, rather than their corporate accounts. These email addresses were primarily Gmail accounts. On information and belief, Defendants sent and received hundreds of scheme-related communications through these and other such accounts:

| Account Owner | Role of Account Owner | Email Address |
|---|---|---|
| Bruno Pescheux | CEO of LCS until July 2014 | brunopescheux@gmail.com |
| Firas Tlass (Intermediary 1) | Defendants' agent and intermediary who paid ISIS on their behalf | Firastlass0l@gmail.com |
| Mamdouh al-Khaled | LCS Purchasing Manager | Mamdouh.lafarge@gmail.com |
| Hassan al-Saleh | LCS Plant Manager | Hassan.cement65@gmail.com |
| Ahmad Jamal | ISIS representative who supplied materials to LCS | Ahmad.jamal1966@gmail.com |

243.    Carrying out a criminal conspiracy via Gmail, rather than corporate email, matched standard practice among terrorists and their funders, who rely on cheap and easily available technologies that are anonymous, such as Gmail.

244.    Defendants' use of Gmail relied on extensive U.S. infrastructure.  Google operated the majority of its data centers in the United States, which enabled Defendants' conspiracy-related emails to reach their destinations securely and reliably, including through regular backups, and to be concealed from Defendants' auditors and French law enforcement authorities.

245.    Defendants and their agents agreed to numerous U.S. contacts by agreeing to and regularly using their U.S. based Gmail accounts.  They reached into the United States to make a contract with a U.S. company, including by agreeing to Google's Terms of Service, which in 2013 made clear that Gmail was "provided by Google, Inc. ('Google'), located at 1600 Amphitheatre Parkway, Mountain View, CA 94043, United States," regulated by the "laws of California, U.S.A. ... "

246.    They also sent and received data and services from Google in the United States. Gmail relies on data-mining to serve targeted searches and sales to users.  U.S. engineers provide the process to scrape data from emails for this customized advertising.  That Google was an American company that was mining data from users' emails was no secret, even in 2014. International news sources reported that Gmail was free, but that Google mined personal data from its users.  Thus, when Defendants signed up for Gmail and used it to carry out their scheme, they knew they were paying an American company for the American service they were using.  Rather than sending a wire transfer delivering cash to their U.S. counterparty, they delivered their data.

247.    Additionally, because Gmail is based in the United States and operates under U.S. law, it is more difficult for foreign prosecutors and regulators to access. U.S. law at the time constrained releases of customer data to foreign governments, making the evidence nearly impossible for European law enforcement to access. Had Defendants chosen to use non-U.S.-based email, such as a free European email service, their communications would have been more susceptible to access by French regulators and law enforcement.

**C.    Defendants Purposely Entered Into A Conspiracy With ISIS, Pursuant to Which ISIS Engaged In Acts That Targeted The United States**

248.    Defendants have admitted, as part of its guilty plea, to conspiring with ISIS whose overall object was to maintain ISIS's territorial control of Syria and Iraq and thereby promote ISIS's protection rackets within those countries.

249.    Defendants recognized that ISIS's terrorist activities were good for everyone's business. They expanded markets and drove out competition, leaving Lafarge to dominate. Lafarge's unusual willingness to pay ISIS gave it a unique opportunity to seize market share, and for the FTOs to expand their operations and commit more terrorist attacks.

250.    For the co-conspirators to continue to profit, ISIS needed to remain in control, expand its reach over territories and markets, and continue to tax and intimidate LCS's competitors. ISIS's constant violence, in turn, backed up its credible threat. Violence was crucial to the racket, because it made the population believe ISIS's willingness to back up its threats. When Defendants participated in ISIS's extortion and protection racket, it joined a conspiracy that was explicit in its purpose of making money through the perpetuation of terrorist violence.

251.    Unsurprisingly, and in line with its express statements, ISIS engaged in numerous overt acts both in and expressly aimed at the United States to further its terrorist aims. ISIS's global ambition and historical roots in al-Qaeda required that it target the United States and

American citizens.  These attacks ramped up as Defendants increased their payments, holding Americans captive and killing American hostages in gruesome video messages directed explicitly to the United States.  As Deputy Attorney General Monaco stated in connection with Lafarge and LCS's guilty plea, during the Defendants' conspiracy, the rest of "the world watched in horror as ISIS murdered innocent journalists and aid workers," inflicting "unimaginable pain and suffering" on "American families whose loved ones were brutally murdered by ISIS."  Defendants only redoubled their efforts to work with ISIS as American forces conducted air strikes against ISIS to stop its siege of Yazidis in August 2014, and after ISIS publicly beheaded American journalists. ISIS publicly celebrated its horrific acts and was open about the fact, before and during the conspiracy, that it was targeting the United States.

252.    The United States' status as a global superpower meant that victimizing Americans was an especially effective way to convey ISIS's authority. ISIS's attacks on and crimes against U.S. citizens and their families in Syria, Iraq, Turkey, and elsewhere, including Plaintiffs, furthered Defendants' conspiracy with ISIS and intermediaries. These acts had symbolic value and allowed ISIS to tout that it could challenge the most powerful country in the world.

253.    ISIS also reached into the United States to further the conspiracy.  Al-Qaeda in Iraq, ISIS's predecessor, threatened the United States numerous times, as did ISIS leaders. ISIS also recruited heavily from the United States, including from this District, drawing a total of approximately 300 U.S. citizens who joined or attempted to join its ranks.  Its members sent and received money from U.S. citizens for attacks in the U.S., and in Syria and Iraq.  ISIS propaganda officials tried to use events in Ferguson, Missouri and Baltimore, Maryland as recruiting tools.

254.    Defendants knew all of this, which is confirmed by their emails: "[W]e should not forget that ISIS is a terrorist movement."  Defendants were also aware that the U.S. government

had designated ISIS as an FTO.  Defendants were familiar with the history of Al-Qaeda in Iraq, through their security consultant and Tlass (Intermediary 1).  Attacks on Americans took place while Lafarge was actively handing millions of dollars to ISIS and were an easily foreseeable result of a conspiracy with a terrorist organization that expressly targeted Americans.

## VI.    Lafarge Merges With Holcim And Pleads Guilty To Conspiring To Provide Material Support To One Or More Foreign Terrorist Organizations.

255.    In early 2014, Lafarge and Holcim, the two largest multinational building companies, began confidential discussions about entering into a share-purchase agreement.

256.    In July 2015, after more than one year of negotiations, Holcim completed its merger with Lafarge. Certain Lafarge executives who had been aware of Lafarge's payments to ISIS remained in leadership positions in the newly formed company, LafargeHolcim.

257.    On February 19, 2016, a website run by an opposition group to the Syrian regime reported that Lafarge and LCS had purchased raw materials from and made other payments to ISIS.  The report included partially redacted images of emails sent to and from Lafarge and LCS executives' email accounts, discussing payments to ISIS.

258.    On April 24, 2017, after retaining a U.S. law firm to conduct an investigation, LafargeHolcim issued a press release acknowledging that Lafarge and LCS were in business with terrorists:  as "terrorist groups designated by the US and the EU were expanding into the area" of the Cement Plant, LCS made "payments" to intermediaries to "avoid direct contact with these armed groups."  LafargeHolcim admitted that "LCS management kept Lafarge SA well-informed of developments."

259.    On October 18, 2022, the Department of Justice announced in a press release that Lafarge and LCS pleaded guilty to a one-count criminal information in the Eastern District of New York charging them with conspiring to provide material support to ISIS and ANF in violation

of 18 U.S.C. § 2339(B)(a)(1).[58] It was the first time the Department of Justice had ever brought such charges against a company.

260.    The Department of Justice's Press Release also stated that U.S. District Judge William F. Kuntz II sentenced Lafarge and LCS to terms of probation and to pay financial penalties, including criminal fines and forfeiture, totaling $777.78 million.

261.    In the release, Deputy Attorney General Lisa O. Monaco said, "The defendants partnered with ISIS, one of the most brutal terrorist organizations the world has ever known, to enhance profits and increase market share—all while ISIS engaged in a notorious campaign of violence during the Syrian civil war."

262.    Assistant Attorney General Matthew G. Olsen of the Justice Department's National Security Division also said, "The defendants routed nearly six million dollars in illicit payments to two of the world's most notorious terrorist organizations—ISIS and al-Nusrah Front in Syria—at a time those groups were brutalizing innocent civilians in Syria and actively plotting to harm Americans…. There is simply no justification for a multi-national corporation authorizing payments to designated terrorist organizations."

## VII.    ISIS's Act Of International Terrorism Harmed Plaintiffs.

### A.    ISIS Commits a Suicide Bombing Attack in Istanbul.

263.    On March 19, 2016, a suicide bomber exploded a bomb in Istanbul's Beyoğlu district. The attack occurred at 10:55 a.m. local time at the intersection of Balo Street and İstiklal Avenue, a shopping area popular with tourists and considered the busiest avenue in Turkey.[59]

---

[58]    Press Release, U.S. Dep't of Justice (Oct. 18, 2022), https://www.justice.gov/opa/pr/lafarge-pleads-guilty-conspiring-provide-material-support-foreign-terrorist-organizations.

[59]    An Explosion occurred on Istiklal Street in Isbanbul, *Hurriyet (Turkey)*, Mar. 20, 2016, http://www.hurriyet.com.tr/son-dakika-istanbul-istiklal-caddesinde-patlama-meydana-geldi-40071967 (translated using Google translate).

264.    The bomber detonated the bomb on his body while passing by a group of tourists in front of a restaurant.

265.    Nails and small pieces of metal were reportedly scattered in the area due to the attack.

266.    According to the testimony of one wounded Israeli, the bomber followed the group of Israelis "for some time" after leaving the hotel.[60] One unverified analysis of the security camera footage at the restaurant indicates that the terrorist was waiting outside of the restaurant.

267.    The terrorist attack caused at least five deaths, including that of the perpetrator.

268.    Two of those killed were U.S. nationals, including Avraham Goldman and Yonatan Suher, whose estates, survivors, and heirs are Plaintiffs in this matter.[61]

269.    Thirty-six people were severely injured, including the wife of Avraham Goldman, Nitzhiya Goldman, and Yonatan Suher's common-law wife, Inbal Merom, who are Plaintiffs in this matter.

270.    While the authorities were quick to blame the Kurdistan Workers' Party (PKK) for the bombing, given the longstanding Kurdish-Turkish conflict,[62] the Turkish authorities changed their initial assessment later in the afternoon of the bombing, instead holding ISIS accountable.

---

[60]    The Meir Amit Intelligence and Terrorism Information Center, Spotlight on Global Jihad (Mar. 17-23, 2016), https://www.terrorism-info.org.il/Data/articles/Art_20979/E_058_16_1494306233.pdf.

[61]    Israeli authorities confirm two fatalities from Istanbul bombing were dual US-Israeli citizens, *The Jerusalem Post*, Mar. 20, 2016, http://www.jpost.com/Israel-News/Israeli-authorities-publicize-name-of-fatality-from-Istanbul-attack-448493.

[62]    Suicide bomber kills four, wounds 36 in Istanbul shopping district, *Reuters*, Mar. 19, 2016, https://www.reuters.com/article/us-turkey-blast/suicide-bomber-kills-four-wounds-36-in-istanbul-shoppingdistrict-idUSKCN0WL0D5.

271.    On March 20, Turkish authorities announced that Mehmet Öztürk, born in 1992 in Gaziantep Province, which borders Syria, was reliably identified by DNA tests to be the suicide bomber of the Istanbul attack.[63]

272.    On March 22, 2016, the Turkish interior minister said that the bomber was a member of the Islamic State of Iraq and the Levant (referenced herein as ISIS). Öztürk, was born in 1992 in the Gaziantep province, near the Syrian border. According to Öztürk's father, Öztürk left home in 2013 for Istanbul. Öztürk reportedly went to Syria the same year and stayed there until 2015 before illegally re-entering Turkey.[64]

273.    Four Turkish citizens were convicted following a trial. On April 5, 2019, Ercan Çapkın and Hüseyin Kaya were convicted to life imprisonment on charges of murder and attempting to abolish the constitutional order. Ercan Çapkın and Hüseyin Kaya were accused of helping the suicide bomber, Öztürk, carry out the attack. An indictment against the two defendants says Çapkın and Kaya were also trained to be suicide bombers by Daesh, *i.e.*, ISIS.[65] Mehmet Mustafa Çevik and İbrahim Gürler were sentenced to 15 years in prison on terrorism-related charges.[66]

---

[63]    Istanbul bomber identified as militant with links to Islamic State, *Chicago Tribune*, Mar. 20, 2016, http://www.chicagotribune.com/news/nationworld/ct-istanbul-suicide-bomb-20160320-story.html.

[64]    *Id.*; Police identifies Istanbul bomber as ISIL member, *Hurriyet Daily News (Turkey)*, Mar. 21, 2016.

[65]    Two sentenced to life for Daesh attack targeting tourists, *Daily Sabah*, Apr. 6, 2019, https://www.dailysabah.com/investigations/2019/04/06/two-sentenced-to-life-for-daesh-attack-targeting-tourists.

[66]    International Crisis Group, A Timeline of ISIS Attacks in Turkey and Corresponding Court Cases, June 29, 2020, https://www.crisisgroup.org/timeline-isis-attacks-turkey-and-corresponding-court-cases.

### B.   The Goldman Family

274.   Avraham and Nitzhiya Goldman, husband and wife, were visiting Istanbul on a culinary tour when they were victims of the ISIS attack.

275.   Avraham Goldman, a U.S. citizen living in Israel, was killed in the explosion.

276.   Nitzhiya Goldman, a U.S. citizen living in Israel, was seriously wounded in the explosion. Her right leg was badly injured and was only saved after multiple surgeries. She was hospitalized in Istanbul after the attack, repatriated to Israel by medical transport, and spent at least one month in Shiva Tel Hashomer Hospital, undergoing orthopedic, plastic, and vascular surgery on her leg. Extensive surgeries were performed that included skin grafts, a ligament transplant, and reconnected nerves and blood vessels. She also had shrapnel wounds throughout her body and required debris to be removed from one of her eyes. She has undergone extensive physical therapy in an effort to regain the ability to walk.

277.   Sharon Goldman-Najman is the daughter of Nitzhiya and Avraham Goldman, and is a U.S. citizen living in Florida.

278.   Maya Goldman Cohen is the daughter of Nitzhiya and Avraham Goldman and is a U.S. citizen living in Israel.

279.   Gila Nissenbaum is the sister of Avraham Goldman. She is a U.S. citizen living in New York.

280.   Nathan Goldman is the brother of Avraham Goldman. He is a U.S. citizen living in New York.

281.   As a result of the attack, and the death of Avraham Goldman, Plaintiffs Nitzhiya Goldman, Sharon Goldman-Najman, Maya Goldman Cohen, Gila Nissenbaum, and Nathan Goldman have experienced severe mental anguish, extreme emotional pain and suffering, and loss of Avraham Goldman's guidance, companionship, society, consortium, and solatium.

### C.    The Suher Family

282.    Yonatan Suher and Inbal Merom, who were common-law husband and wife, under Israeli law, were traveling in Turkey for Yonatan's fortieth birthday when they became victims of the ISIS Attack.

283.    Yonatan Suher, a U.S. citizen living in Israel, was killed in the explosion.

284.    Inbal Merom, an Israeli citizen living in Israel, was wounded in the attack. She was hit with shrapnel all over her body, including lacerations to her liver, hips, and back. She immediately had invasive surgery to her abdominal cavity in Istanbul. The next day after the attack, she was flown back to Israel. While in the hospital in Israel, she had another abdominal surgery. She remained hospitalized for approximately one month before being released. She still suffers from back pain and migraines as a result of the attack, in addition to severe anxiety, depression, and post traumatic stress.

285.    G.S. is the minor daughter of Yonatan Suher and Inbal Merom, age 15, and is now a U.S. citizen living in Israel.

286.    U.S. is the minor son of Yonatan Suher and Inbal Merom, age 13, and is now a U.S. citizen living in Israel.

287.    Randolph Suher is the father of Yonatan Suher and is a U.S. citizen living in Israel.

288.    Yael Suher is the mother of Yonatan Suher and is an Israeli citizen living in Israel.

289.    Amir Suher is the brother of Yonatan Suher and is a U.S. citizen living in Israel.

290.    Eyal Suher is the brother of Yonatan Suher and is a U.S. citizen living in Israel.

291.    Eran Suher is the brother of Yonatan Suher and is a U.S. citizen living in Israel.

292.    Edeete Suher is the sister of Yonatan Suher and is a U.S. citizen living in Israel.

293.    As a result of the attack, and the death of Yonatan Suher, Plaintiffs Inbal Merom, G.S., U.S., Randolph Suher, Yael Suher, Amir Suher, Eyal Suher, Eran Suher, and Edeete Suher,

have experienced severe mental anguish, extreme emotional pain and suffering, and loss of Yonatan Suher's guidance companionship, society, consortium, and solatium.

## CLAIMS FOR RELIEF

### COUNT ONE: VIOLATION OF THE ATA, 18 U.S.C. §§ 2333(a) and 2339A
#### (Providing Material Support To Terrorists)

294.    Plaintiffs incorporate their allegations above.

295.    Defendants agreed to, and did in fact, provide to ISIS material support or resources, as defined in 18 U.S.C. § 2339A(b)(1), by transferring to ISIS millions of dollars, some of which constituted currency and transfers through U.S. banks, and by providing ISIS with cement, which Defendants produced in further of their conspiracy with ISIS, and which ISIS sold for its own benefit to further terrorist attacks.

296.    Defendants also structured their transactions with ISIS to conceal or disguise the nature, location, source, or ownership of Defendants' support.

297.    At the time of this material support, Defendants intended, knew, or were deliberately indifferent to the fact that ISIS would use such material support or resources to prepare for or carry out terrorist attacks, such as the attacks that killed and injured Plaintiffs and their family members, in violation of any of section 32, 37, 81, 175, 229, 351, 831, 842(m) or (n), 844(f) or (i), 930(c), 956, 1091, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, 2340A, or 2442 of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), section 46502 or 60123(b) of title 49, or any offense listed in section 2332b(g)(5)(B) (except for sections 2339A and 2339B).

298.    Defendants' conduct constitutes a violation of 18 U.S.C. § 2339A for providing material support to terrorists.

299.    A violation of 18 U.S.C. § 2339A provides Plaintiffs with a cause of action against Defendants under § 2333(a) for harm caused by an act of international terrorism.

300.    Defendants' violation of 18 U.S.C. § 2339A constitutes an act of international terrorism under 18 U.S.C. § 2331(1). First, Defendants' provision of material support involve violent acts or acts dangerous to human life that are a violation of U.S. criminal laws, specifically 18 U.S.C. § 2339A. Second, Defendants' support for ISIS appears to have been intended (a) to intimidate or coerce the civilian populations of the United States, Turkey, or Israel, (b) to influence the policy of the United States, Turkey, or Israel by intimidation and coercion, and (c) to affect the conduct of the United States, Turkey, or Israel by mass destruction, extrajudicial killing, assassination, and kidnapping/hostage taking. Third, Defendants' provision of material support to ISIS occurred primarily outside the territorial jurisdiction of the United States.

301.    Furthermore, Plaintiffs are U.S. nationals or their estates, survivors, or heirs injured by reason of Defendants' conduct.

302.    Defendants are therefore liable to Plaintiffs under 18 U.S.C. § 2333(a) for violation of 18 U.S.C. § 2339A.

### COUNT TWO: VIOLATION OF THE ATA, 18 U.S.C. §§ 2333(a) and 2339B
### (Providing Material Support or Resources to a Designated FTO)

303.    Plaintiffs incorporate their allegations above.

304.    Defendants conspired to, and did in fact, provide to ISIS material support or resources, as defined in 18 U.S.C. § 2339A(b)(1), by transferring to ISIS millions of dollars, some of which constituted currency and transfers through the U.S. banks, and by providing ISIS with cement, which Defendants produced in further of their conspiracy with ISIS, that ISIS sold for its own benefit to further terrorist attacks.

305.    The United States has designated ISIS as an FTO under § 219 of the Immigration and Nationality Act (8 U.S.C. § 1189) since 2004 under the name Al-Qaeda in Iraq.

306.    At all relevant times, Defendants knew that ISIS was a designated FTO.

307.    At all relevant times, Defendants also knew that ISIS had engaged in and was "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

308.    At the time of this material support, Defendants intended, knew, or were deliberately indifferent to the fact that ISIS would use such material support or resources to prepare for or carry out terrorist attacks, such as the attacks that killed and injured Plaintiffs and their family members.

309.    Defendants' conduct constitutes a violation of 18 U.S.C. § 2339B for providing material support to terrorists.

310.    Indeed, Defendants pleaded guilty to violating 18 U.S.C. § 2339B in the Eastern District of New York on October 18, 2022.

311.    A violation of 18 U.S.C. § 2339B provides Plaintiffs with a cause of action against Defendants under § 2333(a) for harm caused by an act of international terrorism.

312.    Defendants' violation of 18 U.S.C. § 2339B constitutes an act of international terrorism under 18 U.S.C. § 2331(1). First, Defendants' provision of material support to an FTO and conspiracy to do so involve violent acts or acts dangerous to human life that are a violation of U.S. criminal laws, specifically 18 U.S.C. § 2339B. Second, Defendants' support for ISIS appears to have been intended (a) to intimidate or coerce the civilian populations of the United States, Turkey, or Israel, (b) to influence the policy of the United States, Turkey, or Israel by intimidation and coercion, and (c) to affect the conduct of the United States, Turkey, or Israel by mass

destruction, extrajudicial killing, assassination, and kidnapping/hostage taking. Third, Defendants' provision of material support to ISIS occurred primarily outside the territorial jurisdiction of the United States.

313.    Furthermore, Plaintiffs are U.S. nationals or their estates, survivors, or heirs injured by reason of Defendants' conduct.

314.    Defendants are therefore liable to Plaintiffs under 18 U.S.C. § 2333(a) for violation of 18 U.S.C. § 2339B.

### COUNT THREE: VIOLATION OF THE ATA, 18 U.S.C. §§ 2333(a) AND 2339C
### (Providing Terrorist Financing)

315.    Plaintiffs incorporate their allegations above.

316.    In violation of 18 U.S.C. § 2339C(a)(1)(B), Defendants conspired to, and did in fact, provide ISIS with funds with the intention that such funds be used, or with the knowledge or intentional disregard of the fact that such funds are to be used, in full or in part, to carry out acts intended to cause death or serious bodily injury to a civil, or to any other person not taking an active part in the hostilities in a situation of armed conflict and the purpose of ISIS's acts was to intimidate a population, in the United States, Turkey, or Israel, or to compel the governments of any of those three nations to do or abstain from doing any act.

317.    In violation of 18 U.S.C. § 2339C(a)(1)(c), Defendants also knowingly concealed or disguised the nature, location, source, ownership, or control of any material support or resources, or any funds or proceeds of such funds knowing that the support or resources were provided in violation of 18 U.S.C. § 2339B or knowing that they would be provided in violation of 18 U.S.C. § 2339(a).

318.    A violation of 18 U.S.C. § 2339C provides Plaintiffs with a cause of action against Defendants under § 2333(a) for harm caused by an act of international terrorism.

319.    Defendants' violation of 18 U.S.C. § 2339C constitutes an act of international terrorism under 18 U.S.C. § 2331(1). First, Defendants' provision of material support to an FTO and conspiracy to do so involve violent acts or acts dangerous to human life that are a violation of U.S. criminal laws, specifically 18 U.S.C. § 2339C. Second, Defendants' support for ISIS appears to have been intended (a) to intimidate or coerce the civilian populations of the United States, Turkey, or Israel, (b) to influence the policy of the United States, Turkey, or Israel by intimidation and coercion, and (c) to affect the conduct of the United States, Turkey, or Israel by mass destruction, extrajudicial killing, assassination, and kidnapping/hostage taking. Third, Defendants' provision of material support to ISIS occurred primarily outside the territorial jurisdiction of the United States.

320.    Furthermore, Plaintiffs are U.S. nationals or their estates, survivors, or heirs injured by reason of Defendants' conduct.

321.    Defendants are therefore liable to Plaintiffs under 18 U.S.C. § 2333(a) for violation of 18 U.S.C. § 2339C.

### COUNT FOUR: VIOLATION OF THE ATA, 18 U.S.C. § 2333(d)
### (JASTA, Aiding and Abetting Liability)

322.    Plaintiffs incorporate and reallege the allegations of the foregoing paragraphs as if fully set forth herein.

323.    Plaintiffs allege that Defendants knowingly aided and abetted ISIS's commission of an act of international terrorism, within the meaning of 18 U.S.C. § 2333(d) and within the legal framework of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which Congress has found to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA, § 2(b).

324.    Plaintiffs' injuries were proximately caused by the March 19, 2016 ISIS bombing attack.

325.    That ISIS attack was an act of international terrorism as defined by 18 U.S.C. § 2331(1). First, ISIS's attack involves violent acts or acts dangerous to human life that are a violation of U.S. criminal laws. Second ISIS's acts appear to have been intended (a) to intimidate or coerce the civilian populations of the United States, Turkey, or Israel, (b) to influence the policy of the United States, Turkey, or Israel by intimidation and coercion, and (c) to affect the conduct of the United States, Turkey, or Israel by mass destruction, extrajudicial killing, assassination, and kidnapping/hostage taking. Third, ISIS's attack occurred outside the territorial jurisdiction of the United States, and transcended national boundaries in terms of the means by which they are accomplished, the persons they appeared intended to intimidate or coerce, and the locale in which their perpetrators operated.

326.    That attack was committed by an FTO so designated on the date of the attack because the United States has designated ISIS as an FTO under § 219 of the Immigration and Nationality Act (8 U.S.C. § 1189) continuously since 2004.

327.    Moreover, Defendants already admitted that they provided material support to an FTO, by pleading guilty to violating 18 U.S.C. § 2339B in the Eastern District of New York on October 18, 2022.

328.    Defendants are the "person who aid[ed] and abet[ted]" "by knowingly providing substantial assistance" to the person who committed the act of international terrorism, here ISIS, under 18 U.S.C. § 2333(d)(1) and 1 U.S.C. § 1, which defines "person" to include corporations, companies, associations, firms, partnerships, societies, and joint stock companies.

329.    Defendants knowingly provided substantial assistance to ISIS—including by making cash and covert payments through foreign shell companies and intermediaries, purchasing raw material from, and making anti-competitive agreements with, the FTOs, and by failing to safely shut down and evacuate the Cement Plant, thereby placing tons of valuable cement and raw materials in the hands of ISIS.

330.    At all relevant times, Defendants were generally aware of their role in supporting ISIS's illicit conduct and terrorist activities, including financing ISIS terror that supported this terrorist act.

331.    ISIS's bombing attack that injured Plaintiffs was the foreseeable result of Defendants' support for ISIS's terrorist activities.

332.    Plaintiffs are U.S. nationals or their estates, survivors, or heirs injured by reason of Defendants' conduct.

333.    As a result of Defendants' violation of 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

### COUNT FIVE: VIOLATION OF THE ATA, 18 U.S.C. § 2333(d)
### (JASTA Conspiracy Liability)

334.    Plaintiffs incorporate their allegations above.

335.    Plaintiffs allege that Defendants conspired with ISIS, who committed an act of international terrorism, within the meaning of 18 U.S.C. § 2333(d) and within the legal framework of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which Congress has found to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA, § 2(b).

336.    Plaintiffs' injuries were proximately caused by the March 19, 2016 ISIS bombing attack.

337.    That ISIS attack was an act of international terrorism as defined by 18 U.S.C. § 2331(1). First, ISIS's attack involves violent acts or acts dangerous to human life that are a violation of U.S. criminal laws. Second ISIS's acts appear to have been intended (a) to intimidate or coerce the civilian populations of the United States, Turkey, or Israel, (b) to influence the policy of the United States, Turkey, or Israel by intimidation and coercion, and (c) to affect the conduct of the United States, Turkey, or Israel by mass destruction, extrajudicial killing, assassination, and kidnapping/hostage taking. Third, ISIS's attack occurred outside the territorial jurisdiction of the United States, and transcended national boundaries in terms of the means by which they are accomplished, the persons they appeared intended to intimidate or coerce, and the locale in which their perpetrators operated.

338.    That attack was committed by an FTO so designated on the date of the attack because the United States has designated ISIS as an FTO under § 219 of the Immigration and Nationality Act (8 U.S.C. § 1189) since 2004 under the name Al-Qaeda in Iraq.

339.    Defendants are the "person who … conspire[d] with the person [here, ISIS] who committed [the] act of international terrorism" under 18 U.S.C. § 2333(d)(1) and 1 U.S.C. § 1, which defines "person" to include corporations, companies, associations, firms, partnerships, societies, and joint stock companies.

340.    Defendants conspired by, in part, making an agreement with an FTO to, among other activities and goals, provide material support for those organizations in violation of 18 U.S.C. § 2339B, including by agreeing to make cash and covert payments through foreign shell companies to ISIS and purchasing raw material from, and making anti-competitive agreements with, ISIS.

341.    Defendants and ISIS also agreed to structure transactions to conceal and disguise the nature, location, source, or ownership of Defendants' material support or resources, in further violation of 18 U.S.C. § 2339A.

342.    It was reasonable and foreseeable that, as part of the conspiracy and in furtherance of the scheme to support acts of international terrorism, that ISIS would, and in fact did, commit acts of international terrorism, including the bombing attack against Plaintiffs.

343.    ISIS's bombing attack that injured Plaintiffs was foreseeable results of Defendants' support for ISIS's terrorist activities.

344.    Plaintiffs are U.S. nationals or their estates, survivors, or heirs injured by reason of Defendants' conduct.

345.    As a result of Defendants' violation of 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

Plaintiffs request that the Court:

(a)    Enter judgment against Defendants, finding them jointly and severally liable to Plaintiffs under the Anti-Terrorism Act, 18 U.S.C. § 2333;

(b)    Award Plaintiffs compensatory damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(d);

(c)    Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(d);

(d)    Award Plaintiffs prejudgment interest; and

(e)    Award Plaintiffs any such further relief the Court deems just and proper.


Dated: February 9, 2024                    Respectfully Submitted,

                                           /s/ Melissa Fox
                                           _____
                                           Melissa Fox
                                           Michael A. Petrino (*pro hac vice* forthcoming)
                                           Jonathan E. Missner (*pro hac vice* forthcoming)
                                           STEIN MITCHELL BEATO & MISSNER LLP
                                           2000 K Street, NW, Suite 600
                                           Washington, D.C. 20006
                                           Telephone: (202) 737-7777
                                           Facsimile:  (202) 296-8312
                                           mfox@steinmitchell.com

                                           Gavriel Mairone
                                           Adora Sauer (*pro hac vice* forthcoming)
                                           MM~LAW LLC
                                           980 North Michigan Avenue, Suite 1400
                                           Chicago, IL 60611
                                           Telephone: (312) 253-7444
                                           Facsimile:  (312) 275-8590
                                           ctlaw@mm-law.com

                                           *Counsel for Plaintiffs*