UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____
AVRAHAM GOLDMAN et al.,

                         Plaintiffs,

           -against-

LAFARGE S.A. et al.,

                    Defendants.
_____
HELEN JANE WILSON et al.,

                         Plaintiffs,

           -against-

LAFARGE S.A. et al.,

                    Defendants.
_____

**MEMORANDUM & ORDER**
**24-CV-1043 (NGG) (PK)**


**25-CV-1975 (NGG) (PK)**

NICHOLAS G. GARAUFIS, United States District Judge.

Before the court are two cases concerning atrocities committed by the Islamic State in Iraq and Syria ("ISIS"). In one, Avraham Goldman and those similarly situated (the "*Goldman* Plaintiffs") assert claims arising out of the terrorist group's March 19, 2016 suicide bombing in the Beyoğlu shopping district of Istanbul. (*Goldman v. Lafarge S.A.*, No. 24-CV-1043 (NGG) (PK) (the "*Goldman* Compl.") (Dkt. 1) ¶ 1.) In the other, Helen Jane Wilson and those similarly situated (the "*Wilson* Plaintiffs") assert claims arising out of ISIS's November 13, 2015 attack on the Bataclan Theatre in Paris and its March 22, 2016 attack on Brussels Airport. (*Wilson v. Lafarge S.A.*, No. 25-CV-1975 (NGG) (PK) (the "*Wilson* Compl.") (Dkt. 1) ¶ 1.)

In their complaints (collectively, the "Complaints"), the *Goldman* and *Wilson* Plaintiffs seek compensation from Defendants Lafarge S.A., Lafarge Cement Holding Limited, and Lafarge Cement Syria S.A. (collectively, the "Defendants"). (*Goldman* Compl. ¶¶ 20-22; *Wilson* Compl. ¶¶ 64-66.) In relevant part, they

allege primary liability under the Anti-Terrorism Act (the "ATA"). (18 U.S.C. § 2331 *et seq.*) (*See Goldman* Compl. ¶¶ 294-321; *Wilson* Compl. ¶¶ 458-487.) They reason that the Defendants made payments to ISIS which "enabled the terrorist attacks" in Istanbul, Paris, and Brussels. (*Wilson* Compl. ¶ 214; *see Goldman* Compl. ¶¶ 175, 178.)

The Defendants now move to dismiss those primary-liability claims. (Mem. of L. in Supp. of Defs.' Combined Mot. to Dismiss Pls.' Primary Liability Claims ("Defs.' Mot.") (Dkt. 42) at 17.) For the reasons discussed below, the court GRANTS the Defendants' motion. Counts I, II, and III of the *Goldman* Complaint and Counts IV, V, and VI of the *Wilson* Complaint are DISMISSED WITH PREJUDICE.

## I.    FACTUAL BACKGROUND

Lafarge S.A. is a building materials manufacturer organized under the laws of France and headquartered in Paris. (*Goldman* Compl. ¶ 20; *Wilson* Compl. ¶ 64.) It owns Lafarge Cement Holding Ltd., a holding company organized under the laws of and headquartered in Cyprus. (*Goldman* Compl. ¶ 21; *Wilson* Compl. ¶ 65.) It, in turn, is the primary shareholder of Lafarge Cement Syria S.A., a company organized under the laws of Syria and headquartered in Damascus. (*Goldman* Compl. ¶ 22; *Wilson* Compl. ¶ 66.) Lafarge Cement Syria S.A. operated a cement plant, located in the Jalabiyeh region of Syria (the "Jalabiyeh Plant"), from approximately May 2010 until September 2014. (*Goldman* Compl. ¶ 2; *Wilson* Compl. ¶ 66.)

In 2011, civil war broke out in Syria. (*Goldman* Compl. ¶ 82; *Wilson* Compl. ¶ 78.) Various armed factions operated within Syria at that time, including ISIS and the Al-Nusra Front ("ANF"). These terrorist groups gained control over large parts of Syria as the civil war progressed. (*Goldman* Compl. ¶ 85; *Wilson* Compl. ¶ 79.) "By March 2013, armed groups had taken over the area

around Raqqa and quickly established checkpoints at access roads to the [Jalabiyeh] Plant." (*Goldman* Compl. ¶ 92; *see Wilson* Compl. ¶ 97.) That same year, Lafarge S.A. and Lafarge Cement Syria S.A. began making payments to intermediaries who purported to pay ISIS and ANF. (*Goldman* Compl. ¶¶ 101, 104, 108, 111; *Wilson* Compl. ¶ 101.) They also sold cement to ISIS. (*Goldman* Compl. ¶ 15; *Wilson* Compl. ¶ 101.) In addition, the Complaints contain allegations that the Defendants negotiated revenue-sharing and market-control agreements with ISIS to block competitors from its territory. (*Goldman* Compl. ¶¶ 106-140, 153; *Wilson* Compl. ¶ 92.)

The *Goldman* and *Wilson* Plaintiffs acknowledge, however, that "[n]either Lafarge nor [Lafarge Cement Syria S.A.] made payments to ISIS or ANF because they supported the terrorist organizations' ideology or methods." (*Wilson* Compl. ¶ 83; *see Goldman* Compl. ¶ 7 (alleging only that Defendants entered into agreements with ISIS "for the express purpose of promoting Defendants' security and economic interest and incentivizing ISIS to protect those interests").) Still, they allege that the millions paid by Defendants allowed ISIS to fund numerous soldiers and attacks.[1] (*Goldman* Compl. ¶¶ 176-177, 180; *Wilson* Compl. ¶ 114.)

Those attacks include the massacres in Istanbul, Paris, and Brussels. (*Goldman* Compl. ¶ 1; *Wilson* Compl. ¶ 1.) The *Goldman* and *Wilson* Plaintiffs are victims of those slaughters, along with their

---

[1] The *Goldman* and *Wilson* Plaintiffs also contend that the Defendants' cement "enabled ISIS to build tunnels and structures for territorial control well beyond 2014," thereby "contributing to its ability to commit attacks like the one at issue." (*Goldman* Compl. ¶¶ 181-182; *Wilson* Compl. ¶ 92.) It is unclear, however, how ISIS's "territorial control" was relevant to the three attacks at issue in these two cases. Crucially, each was outside of ISIS territory, along with its "tunnels and structures." (*See Goldman* Compl. ¶¶ 1, 181-182; *Wilson* Compl. ¶¶ 1, 92.)

families. (*Id.*) They now seek compensation from the Defendants for the part they played in ISIS's sanguinary orchestra of death.

## II.  PROCEDURAL HISTORY

In February 2024, the *Goldman* Plaintiffs filed suit against the Defendants under the ATA and Justice Against Sponsors of Terrorism Act ("JASTA"). (*See* Goldman Compl.) They pled three counts of primary liability, one count of conspiracy liability, and one count of aiding-and-abetting liability. (*See Goldman* Compl. ¶¶ 294-345.) In April 2025, the *Wilson* Plaintiffs filed their suit against the Defendants under the same statutes. (*See generally Wilson* Compl.) They pled three counts of primary liability, three counts of conspiracy liability, and one count that "repeat[s] and re-allege[s]" all claims against Holcim AG, the Defendants' successor company. (*See Wilson* Compl. ¶¶ 424-491.)

The *Goldman* and *Wilson* Plaintiffs are not the only ones to sue the Defendants over the Jalabiyeh Plant. These two cases are among several related ATA actions against the Defendants.[2] In August 2025, the court granted in part the Defendants' motion to dismiss three of those related cases, dismissing the aiding-and-abetting claims in each. *See Finan v. Lafarge S.A.*, No. 22-CV-7831 (NGG) (PK), 2025 WL 2504317, at *25 (E.D.N.Y. Aug. 29, 2025). After the court's ruling in *Finan*, the Defendants filed the present motions to dismiss the *Goldman* and *Wilson* Plaintiffs' primary-liability claims under Federal Rule of Civil Procedure 12(b)(6). (*See* Defs.' Mot. at 1.)

---

[2] *See Finan v. Lafarge S.A.*, No. 22-CV-7831 (NGG) (PKK) (E.D.N.Y.); *Fields v. Lafarge S.A*, No. 23-CV-0169 (NGG) (PKK) (E.D.N.Y.); *Foley v. Lafarge S.A.*, No. 23-CV-5691 (E.D.N.Y.); *Murad v. Lafarge S.A.*, No. 23-CV-9186 (NGG) (PKK) (E.D.N.Y.); *Black v. Lafarge S.A.*, No. 24-CV-8901 (NGG) (PKK) (E.D.N.Y.); *Shirley v. Lafarge S.A.*, No. 25-CV-4248 (NGG) (PKK) (E.D.N.Y.); *Stallter v. Lafarge S.A.*, No. 25-CV-6749 (NGG) (PK) (E.D.N.Y.).

## III. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).[3] A claim is plausible when the plaintiff "plead[s] factual content [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663; *see Matson v. Bd. of Educ.,* 631 F.3d 57, 63 (2d Cir. 2011). Although detailed factual allegations are not required, the pleading standard "requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 545 (2007). Thus, courts ruling on a motion to dismiss "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 555.

## IV. DISCUSSION

The ATA provides liability where a plaintiff has been injured "by reason of an act of international terrorism." 18 U.S.C. § 2333(a). Consequently, a plaintiff must allege that a defendant's actions qualify as international terrorism and that they proximately caused her injuries. *Linde v. Arab Bank, PLC,* 882 F.3d 314, 325-26 (2d Cir. 2018); *Zapata v. HSBC Holdings PLC,* 414 F. Supp. 3d 342, 355-56 (E.D.N.Y. 2019) (citing *Rothstein v. UBS AG,* 708 F.3d 82, 95 (2d Cir. 2013)). The *Goldman* and *Wilson* Plaintiffs have failed to plausibly allege either requirement. The court now explains why.

---

[3] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

## A. An Act of International Terrorism

Under the ATA, "international terrorism means activities that" satisfy three criteria. 18 U.S.C. § 2331(1). First, they must "involve violent acts or acts dangerous to human life" which "violat[e] of the criminal laws of the United States or of any State, or . . . would . . . violat[e] [those laws] if committed within the jurisdiction of the United States." *Id.* § 2331(1)(A). Second, the activities must "appear to be intended to intimidate or coerce a civilian population; influence the policy of a government by intimidation or coercion; or affect the conduct of a government by mass destruction, assassination, or kidnapping." *Id.* § 2331(1)(B). Third, they must "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries." *Id.* § 2331(1)(C). All parties agree that the *Goldman* and *Wilson* Plaintiffs satisfy the third requirement, leaving only the first two in dispute. (*See* Defs.' Mot. at 8-9; Pls.' Joint Opp'n to Defs.' Mot. to Dismiss ("Pls.' Opp'n") (Dkt. 43) at 7.) Neither has been satisfied.

### 1. An Act Dangerous to Human Life in Violation of Law

Under the first § 2331(1) requirement, plaintiffs must allege either "violent acts or acts dangerous to human life." 18 U.S.C. § 2331(1)(A). Financial support to a terrorist organization can qualify as the latter, but it must itself be "directed at a specifically identifiable violent or dangerous act."[4] *Hakimyar v. Habib Bank Ltd.*, No. 24-CV-0993 (LGS), 2025 WL 605575, at *5 (S.D.N.Y.

---

[4] The financial support must also be a "criminal violation," or at least would be "if committed within the jurisdiction of the United States." 18 U.S.C. § 2331(1)(A). The Defendants maintain that even if their actions were "dangerous," they were not "criminal." *Id.*; (*see* Defs.' Mot. at 13-14; Defs.' Reply at 7). The court need not address this argument, however, because the *Goldman* and *Wilson* Plaintiffs have failed to allege a "violent" or "dangerous" act. *See* 18 U.S.C. § 2331(1)(A).

Feb. 25, 2025) (citing *Linde*, 882 F.3d at 321, 327 (holding that "bank transfers [which] were explicitly identified as payments for suicide bombings" could qualify an act of international terrorism, but "routine financial services to members and associates of terrorist organizations" do not)).

The Defendants argue that the *Goldman* and *Wilson* Plaintiffs "entirely fail to link [the Defendants'] payments to ISIS to any 'specifically identifiable violent or dangerous act.'" (Defs.' Mot. at 10 (quoting *Hakimyar*, 2025 WL 605575, at *5).) Instead, they maintain that all the *Goldman* and *Wilson* Plaintiffs allege is "illegal support to terrorists engaged in extreme violence." (*Id.* (quoting *Hakimyar*, 2025 WL 605575, at *6).) Therefore, according to the Defendants, the *Goldman* and *Wilson* Plaintiffs inadequately rely on "generalized allegations" that "are insufficient to show 'the kind of direct connection to violence or endangerment of human life' that would render financial assistance an "act[] of international terrorism [itself]." (*Id.* (quoting *King v. Habib Bank Ltd.*, No. 20-CV-4322 (LGS), 2022 WL 4537849, at *5 (S.D.N.Y. Sept. 28, 2022)).) "[O]n this ground alone," the Defendants urge the court to dismiss the *Goldman* and *Wilson* Plaintiffs' primary-liability claims. (*Id.*)

The *Goldman* and *Wilson* Plaintiffs see things differently. They contend that they "far more than plausibly allege [that the Defendants] participated in the type of violent and dangerous acts that constitute international terrorism." (Pls.' Opp'n at 8-9.) They point to allegations that the "Defendants' acts—involving 'donations,' security payments, and payments to ISIS-controlled suppliers, entering revenue-sharing agreements, and supplying cement." (*Id.* at 8.) They also highlight the Defendants' admission that they "contribute[d] to the economy of ISIS." (*Id.*) The *Goldman* and *Wilson* Plaintiffs "further allege that [the Defendants] . . . expected violence in return for their payments" to ISIS. (*Id.*) This is what, according to the *Goldman* and

*Wilson* Plaintiffs, "had made [ISIS] such an enticing business partner in the first place: terrorist attacks to expand and maintain its control of territory and markets." (*Id.*)

The *Goldman* and *Wilson* Plaintiffs then shift their focus to caselaw. They state that the Defendants "fail to identify any ATA cases" regarding "allegations remotely as [grave] as those against [the Defendants]." (*Id.* at 9.) They argue that unlike the Defendants here, the banks in those other cases only "had indirect ties to terrorists." (*Id.*) The *Goldman* and *Wilson* Plaintiffs then reiterate that "primary liability may still lie where banking services are directed at a specifically identifiable violent or dangerous act." *King*, 2022 WL 4537849, at *5 (quoting *Linde*, 882 F.3d at 321). They say that the Defendants' "revenue-sharing agreement to increase payments to ISIS" satisfies this standard. (*Id.* at 10.) Similarly, the *Goldman* and *Wilson* Plaintiffs cite *Miller v. Arab Bank, PLC.* (*Id.* (quoting 372 F. Supp. 3d 33, 45 (E.D.N.Y. 2019)).) There, the court denied a motion to dismiss primary-liability claims under the ATA because "[t]he most plausible inference" was that the defendant "knew it was doing business with terrorists who were going to use violence to attack civilians." (*Id.* (quoting 372 F. Supp. 3d at 45).) For similar reasons, the *Goldman* and *Wilson* Plaintiffs conclude that they have sufficiently "identif[ied] a direct connection" between the Defendants' payments and ISIS's attacks. (*Id.* at 12 (citing *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 90 (E.D.N.Y. 2019)).)

The court agrees with the Defendants. As they explain, the *Goldman* and *Wilson* Plaintiffs have failed to allege that the payments to ISIS were "directed at a specifically identifiable violent or dangerous act." *See Hakimyar*, 2025 WL 605575, at *5 (citing *Linde*, 882 F.3d at 321, 327). True, pre-JASTA out-of-circuit caselaw mused that primary liability under the ATA had "the character of secondary liability." *King*, 2022 WL 4537849, at *4 (citing *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 691 (7th Cir.

2008) (en banc)). But after JASTA expressly created secondary liability, that caselaw became "inapposite."[5] *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 499 n.14 (2d Cir. 2021).

Consequently, the *Goldman* and *Wilson* Plaintiffs' reliance on *Miller* is misplaced. *See* 372 F. Supp. 3d at 39-40. The defendant there had allegedly made "martyr payments" to terrorists who died committing attacks. *Id.* To operate its scheme, the defendant had received detailed lists of terrorists and their violent causes of death. *Id.* at 45. Here, by contrast, the Defendants neither made payments linked to specific terroristic acts, nor created a "scheme" to "incentivize" further acts of violence. *See id.*; *Ranaan v. Binance Holdings Ltd.*, No. 24-CV-0697 (JGK), 2025 WL 605594, at *16 (S.D.N.Y. Feb. 25, 2025) (distinguishing *Miller* because the *Ranaan* defendants did not make payments "clearly earmarked for terrorist activity"). They instead allegedly made "protection payments" and entered into revenue-sharing and market-control agreements that "contribut[ed] to the economy of ISIS." (Pls.' Opp'n at 5, 20.) These "generalized allegations" are not directly connected to any specific act of violence, making

---

[5] The *Goldman* and *Wilson* Plaintiffs' reliance on *Schansman v. Sberbank of Russia PJSC* is similarly unpersuasive. *See* 565 F. Supp. 3d 405 (S.D.N.Y. 2021). The court in *Schansman* relied on "outdated law" from *Boim*. (*See* Defs.' Mot. at 10 n.5 (citing *Boim*, 549 F.3d 685).) In response, the *Goldman* and *Wilson* Plaintiffs misread *Honickman* to contest that *"Boim* is inapposite for secondary" liability. (*See* Pls.' Opp'n at 12 n.11 (citing *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 499 n.14 (2d Cir. 2021).) The Second Circuit explicitly stated in *Honickman* that *Boim*'s holding regarding *"primary* liability under the ATA" was "inapposite." *Honickman*, 6 F.4th at 499 n.14 (emphasis added).

them "insufficient" to allege primary liability under the ATA.[6] *See King,* 2022 WL 4537849, at \*5.

For the foregoing reasons, the *Goldman* and *Wilson* Plaintiffs have failed to state a claim for primary liability under the ATA. *See Linde,* 882 F.3d at 321.

### 2.  Terroristic Intent

Under the second § 2331(1) requirement, a defendant's terroristic act conduct "must appear to be intended to intimidate or coerce a civilian population or to influence or affect a government." *Linde,* 882 F.3d at 326. This "is not a question of the defendant's subjective intent but rather a question of what its intent objectively appeared to be." *Weiss v. Nat'l Westminster Bank, PLC,* 993 F.3d 144, 161 (2d Cir. 2021); *Zapata,* 414 F. Supp. 3d at 358 (quoting 18 U.S.C. § 2331(1))), *aff'd,* 825 F. App'x 55 (2d Cir. 2020) (summary order) ("An ATA complaint must plausibly allege that the conduct at issue objectively 'appea[red] to be intended' to intimidate civilians or influence a government."). Still, courts do not disregard "the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 430 (2d Cir. 2011); *Zapata,* 414 F. Supp. 3d at 358 (quoting *L-7 Designs* in the ATA context).

---

[6] To be sure, the *Goldman* and *Wilson* Plaintiffs allege that "in return" for the Defendants' payments, ISIS "executed the very terroristic attacks that made it an 'enticing business partner.'" (Pls.' Opp'n at 8 (citing *Goldman* Compl. ¶ 175; *Wilson* Compl. ¶ 223).) But the *Goldman* and *Wilson* Plaintiffs do not provide any facts to support that conclusory allegation. *See Twombly,* 550 U.S. at 555 (holding that courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Indeed, the pleaded facts imply a lack of connection between specific attacks and the amount of money that the Defendants paid ISIS. Instead, the Defendants own economic activities likely would have determined the funds ISIS received from "protection payments," revenue-sharing agreements, and market-control agreements. (*See id.* at 8 n.7, 20.)

The Defendants argue that the Complaints "set[] forth such a plausible alternative explanation for [their] conduct." (Defs.' Mot. 12 (quoting *Zapata*, 414 F. Supp. 3d at 358).) They contend that the *Goldman* and *Wilson* Plaintiffs admit that the Defendants were "motivated by the opportunity to make money." (*Id.* at 12 (quoting *Freeman*, 413 F. Supp. 3d at 90; citing *Goldman* Compl. ¶¶ 7-8, 10; *Wilson* Compl. ¶¶ 82-83, 302).) They also note that the *Goldman* and *Wilson* Plaintiffs explicitly concede that the Defendants did not "ma[k]e payments to ISIS or ANF because they supported the terrorist organizations' ideology or methods." (*Id.* at 12 (quoting *Goldman* Compl. ¶ 5; *Wilson* Compl. ¶ 83).) The Defendants view these admissions as "fatal" to the primary-liability claims.

The *Goldman* and *Wilson* Plaintiffs disagree. They emphasize that the Defendants' objective intent "depends on . . . what the defendant knew" at the time of the payments. (Pls.' Opp'n at 13-14 (quoting *Weiss*, 993 F.3d at 161).) They note that the Defendants "knew" that they were "providing money and building materials to [a terrorist organization] that had no other purpose than to perpetuate violence." (Pls.' Opp'n at 13 (citing *Goldman* Compl. ¶ 100; *Wilson* Compl. ¶ 81).) They then point to a Florida court's conclusion that "[w]here support is given to a known terrorist group having only violent organizational goals[,] . . . there is at least a jury question as to whether the payments were made with the requisite 'knowing or intending' *mens rea*[.]"[7] (*Id.* at 14

---

[7] The *Goldman* and *Wilson* Plaintiffs cite *Zapata* for further support. (Pls.' Opp'n at 16 (citing *Zapata*, 414 F. Supp. 3d at 358).) In *Zapata*, the court reasoned that "laundering money that the [c]artels [had] independently accumulate[d] is an act of a fundamentally different sort from giving terrorist organizations money that they do not already have." (*Id.* at 16 (quoting *Zapata*, 414 F. Supp. 3d at 358).) This language, according to the *Goldman* and *Wilson* Plaintiffs, distinguishes between "purely terrorist organizations" and organizations like cartels that also conduct independent activities. (*Id.*)

(quoting *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1320 (S.D. Fla. 2018)).) The *Goldman* and *Wilson* Plaintiffs then seek to distinguish this case from *Freeman*. (*Id.* at 15 (citing *Freeman*, 413 F. Supp. 3d at 92).) Unlike in *Freeman*, they observe that the Defendants "directly entered [into] agreements" with ISIS. (*Id.* at 15 (citing *Freeman*, 413 F. Supp. 3d at 92).) As a final point, the *Goldman* and *Wilson* Plaintiffs stress that "a defendant's apparent intent may be *both* to profit *and* to intimidate or coerce a government or civilian population." (*Id.* at 17 (citing *United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014)).) Thus, admitting to the former does not necessarily preclude the latter. (*Id.*) Their arguments, the *Goldman* and *Wilson* Plaintiffs conclude that their "allegations [are] sufficient to support a claim for primary liability." (*Id.* at 14-15 (quoting *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 50 (D.D.C. 2010)).)

Again, the court agrees with the Defendants. The *Goldman* and *Wilson* Plaintiffs are correct that both profit and terroristic aims can simultaneously motivate an ATA defendant. But the *Wilson* Complaint expressly admits that the Defendants did not pay ISIS "because they supported the terrorist organizations' ideology or methods." (Defs.' Reply in Supp. of Mot. to Dismiss ("Defs.' Reply") (Dkt. 44) at 6 (quoting *Wilson* Compl. ¶ 83).) And both Complaints admit that the Defendants acted for the "specific purpose of protecting [their] employees, assets, and future economic opportunities in Syria." (*Wilson* Compl. ¶ 82; *see Goldman* Compl. ¶ 8; Defs.' Reply at 6.) Thus, it is immaterial if the Defendants knew that their payments to ISIS would inevitably support terrorist operations. The Complaints "unmistakably set forth" only one "plausible explanation for [the Defendants'] conduct: greed." *See Zapata*, 414 F. Supp. 3d at 358-59. For that reason, the *Goldman* and *Wilson* Plaintiffs have failed to allege terroristic intent. *See L-7 Designs. Inc.*, 647 F.3d at 430; *Weiss*, 993 F.3d at 161.

*     *     *

In sum, the *Goldman* and *Wilson* Plaintiffs failed to allege that the Defendants committed "an act of international terrorism" under the ATA. *See* 18 U.S.C. § 2331(1)(A); *Linde*, 882 F.3d at 325-26.

### B.  Proximate Causation

The ATA requires a plaintiff to demonstrate proximate cause. *See Rothstein*, 708 F.3d at 95 (explaining that a proximate cause requirement flows from the "well-understood meaning" of the ATA's "'by reason of' language"). Thus, a plaintiff must allege that her "injury was reasonably foreseeable or anticipated as a natural consequence" of a defendant's acts, and that those "acts were a substantial factor in the sequence of responsible causation." *Id.* at 91 (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003)). To satisfy the substantial factor prong, "the central question . . . is whether the alleged violation led directly to the plaintiff's injuries."[8] *Id.* at 91-92 (*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)).

The Defendants contend that the *Goldman* and *Wilson* Plaintiffs have failed to satisfy proximate causation's substantial-factor prong. They reason that the Complaints did not "allege a sufficiently direct relationship between the . . . alleged conduct and . . . the injuries." (Defs.' Mot. at 15.) Like in *Zapata*, they also observe that the Complaints contain "no plausible inference that [ISIS] would not be able to commit these acts of violence

---

[8] To be sure, *Rothstein* concerned aiding-and-abetting claims under the ATA, not primary-liability claims. *See* 708 F.3d at 88. Nonetheless, courts have applied *Rothstein*'s formulation of the substantial-factor prong to primary-liability allegations. *See, e.g., Zapata*, 414 F. Supp. 3d at 355-56 (citing *Rothstein*, 708 F.3d at 95); *Miller*, 372 F. Supp. 3d at 45 (citing *Rothstein*, 708 F.3d at 92). Further, the Second Circuit noted during its primary-liability discussion in *Linde* that, "at common law, proximate causation demands 'some direct relation between the injury asserted and the injurious conduct alleged.'" 882 F.3d at 321 (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)).

13

without [the Defendants] first laundering their money." (*Id.* (citing *Zapata*, 414 F. Supp. 3d at 356).) According to the Defendants, this is true even if ISIS's "ability to carry out the attacks" at issue "would have been severely crippled and limited" in the absence of the Defendants' payments. (*Id.* (citing *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525, 533 (S.D.N.Y. 2019), *vacated in part on other grounds*, 999 F.3d 842 (2d Cir. 2021)).)

In support of their arguments, the Defendants focus on three sets of allegations. First, they discuss the *Goldman* and *Wilson* Plaintiffs' allegations that "Defendants' payments to ISIS in 2013–2014 . . . assumed an outsized role in financing ISIS violence through at least the end of 2017." (*Id.* at 15-16 (quoting *Finan v. Lafarge S.A.*, No. 22-CV-7831 (NGG) (PK), 2025 WL 2504317, at *20 (E.D.N.Y. Aug. 29, 2025).) The Defendants assert that the court already ruled in the related *Finan* case that this was a mere legal conclusion, and therefore insufficient to state a claim under Rule 12(b)(6). (*Id.* at 15-16 (citing *Finan*, 2025 WL 2504317, at *19).) Second, the Defendants discuss the *Goldman* and *Wilson* Plaintiffs' "alleg[ations] that Defendants' payments 'allowed ISIS to create more explosives, capture more territory, recruit new members, disseminate extensive propaganda, and expand to new regions and countries.'" (*Id.* at 16 (quoting *Wilson* Compl. ¶ 214; citing *Goldman* Compl. ¶ 178).) In the Defendants' view, these statements are similarly "conclusory allegations" and "simply insufficient to support a complaint." (*Id.* (quoting *Zapata*, 414 F. Supp. 3d at 357; citing *Kaplan*, 405 F. Supp. 3d at 533).) Third, the Defendants examine the *Goldman* and *Wilson* Plaintiffs' allegations that their "payments to and partnership with ISIS provided ISIS capital to transform from a fledgling militia in the early 2010s into a brutal terroristic behemoth with the capability and intent to kill Americans." (*Id.* (quoting *Wilson* Compl. ¶ 214; citing *Goldman* Compl. ¶ 174).) The Defendants state that those allegations do no more than "impute responsibility" onto them

14

for ISIS's "continued existence." (*Id.* at 17 (quoting *Zapata*, 414 F. Supp. 3d at 357).) Consequently, the Defendants conclude that the Complaints unduly seek to "effectively hold[] [them] liable" for all of ISIS's terrorist attacks. (*Id.* (citing *Zapata*, 414 F. Supp. 3d at 357).)

In response, the *Goldman* and *Wilson* Plaintiffs argue that they have sufficiently alleged proximate causation. As they note, "[a]llegations that a defendant provided money to terrorist organizations . . . strengthens the inference that plaintiffs injuries were proximately caused by a defendant's conduct under the ATA." (Pls.' Opp'n at 18-19 (quoting *Miller*, 372 F. Supp. 3d at 45 (citing *Rothstein*, 708 F.3d at 97)).) They also explain that primary liability under the ATA "does not require a defendant's conduct to be the 'but for' cause of a plaintiff's injuries." (*Id.* at 19 (quoting *Miller*, 372 F. Supp. 3d at 46).) For these reasons, the *Goldman* and *Wilson* Plaintiffs analogize to cases where the court denied motions to dismiss. They start with *Miller*. (*Id.* at 20 (citing 372 F. Supp. 3d at 46).) Like in *Miller*, they contend, the Defendants' payments "materially strengthened ISIS's ability to commit terror attacks, including the [a]ttack that killed and injured Plaintiffs." (*Id.* (quoting *Goldman* Compl. ¶ 174; citing *Wilson* Compl. ¶ 232).) The *Goldman* and *Wilson* Plaintiffs next discuss *Schansman*. (*Id.* (citing 565 F. Supp. 3d 405, 418 (S.D.N.Y. 2021)).) Like in *Schansman*, the *Goldman* and *Wilson* Plaintiffs stress that the "Defendants' money translated directly into fighters, guns, and bombs the terrorists used to plan and execute their terrorist acts against [them]." (*Id.* (quoting *Wilson* Compl. ¶ 217; citing *Goldman* Compl. ¶ 176).) The *Goldman* and *Wilson* Plaintiffs also highlight that the Complaints detail how ISIS deployed taxation-like payments obtained from entities like Defendants to support "[t]he mujahidin and jihad." (*Id.* at 20-21 (quoting *Goldman* Compl. ¶ 177; *Wilson* Compl ¶ 227).)

The *Goldman* and *Wilson* Plaintiffs also seek to distinguish the present case from the Defendants' supporting caselaw. They note that, unlike in *Zapata*, the Defendants here "provided [their] own money directly to known designated terrorists." (*Id.* at 21 (citing *Goldman* Compl. ¶ 15; *Wilson* Compl. ¶ 88).) And unlike in *Kaplan*, the Complaints here "contain entire sections . . . connecting the funds transferred by Defendants . . . directly to ISIS for the explicit purpose of acquiring lethal equipment to carry out terrorist attacks." (*Id.* at 22 (citing *Goldman* Compl. ¶¶ 174-194; *Wilson* Compl. ¶¶ 228-237).)

Lastly, the *Goldman* and *Wilson* Plaintiffs address the "temporal and geographic factors" separating the Defendants' payments from the attacks at issue in this case. (*Id.*) They state that "courts addressing the[se] issues have rejected" the Defendant's arguments against proximate causation. (*Id.* (collecting cases).) Nonetheless, they assert that the Defendants "overlook that the Complaints set forth allegations sufficient to satisfy any temporal and geographic gaps." (*Id.* at 22-23 (citing various provisions of the Complaints).)

Here too, the court agrees with the Defendants. The *Goldman* and *Wilson* Plaintiffs have failed to allege a sufficiently direct relationship between the Defendants' payments to ISIS and the specific terrorist attacks at issue. The Complaints only contain broad allegations connecting similar taxation-like payments to ISIS's general capacity to carry out attacks like those against the *Goldman* and *Wilson* Plaintiffs. But that is beside the point. Unlike in *Miller*, the Defendants' payments here were not tied to individual terrorist operations such that they "incentivized" specific "acts of violence."[9] *See* 372 F. Supp. 3d at 39, 46. An

---

[9] In their argument to the contrary, the *Goldman* and *Wilson* Plaintiffs' rely on *Schansman*. (*See* Pls.' Opp'n at 20-21 (citing 565 F. Supp. 3d at 418).)

"alternative rule . . . would necessarily" establish proximate causation against the Defendants for "each and every ISIS terrorist act committed anywhere in the world." *See Finan*, 2025 WL 2504317, at *20; (Reply Br. at 8 (quoting the same)). That is "precisely the kind of unlimited, sprawling, and speculative liability that proximate cause forbids." *See Zapata*, 414 F. Supp. 3d at 357 (citing *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982)). Given that, the *Goldman* and *Wilson* Plaintiffs failed to allege that the Defendants' payments to ISIS were a "substantial factor in the sequence of responsible causation" that "led directly" to ISIS's attacks against them. *See Rothstein*, 708 F.3d at 91-92. Consequently, they have failed to establish proximate causation. *See id.* at 95.

## V.  CONCLUSION

For the foregoing reasons, the court DISMISSES WITH PREJUDICE the *Goldman* and *Wilson* Plaintiffs' primary-liability claims.

SO ORDERED.

Dated:    Brooklyn, New York
          February 18, 2026

NICHOLAS G. GARAUFIS
United States District Judge

---

As the Defendants explain, however, that case only discussed the foreseeability prong of the ATA's proximate cause analysis. (*See* Defs.' Reply at 9 (citing *Schansman*, 565 F. Supp. 3d at 418).) As the *Goldman* and *Wilson* Plaintiffs admit, the "Defendants do not challenge [the] proximate cause allegations on foreseeability grounds." (Pls.' Opp'n at 19.) Thus, *Schansman* is irrelevant to the present case. *See Schansman*, 565 F. Supp. 3d at 418-19.